# United States Court of Appeals
## For the First Circuit
### For the First Circuit

No. 02-2174

GTE WIRELESS, INC., f/k/a
GTE MOBILNET SERVICE CORP., a Delaware Corporation,
Plaintiff, Appellant,

v.

CELLEXIS INTERNATIONAL, INC., an Arizona Corporation and
FREEDOM WIRELESS, INC., a Nevada Corporation,
Defendants, Appellees,

and

DOUGLAS V. FOUGNIES,
Defendant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Douglas P. Woodlock, U.S. District Judge]

---

Before

Torruella, Circuit Judge,
Bownes, Senior Circuit Judge,
and Lynch, Circuit Judge.

---

Scott G. Lindvall, with whom Patricia J. Clarke, Darby & Darby P.C., Douglas J. Kline, Jennifer L. Conrad, Testa, Hurwitz & Thibeault, LLP, were on brief, for appellant.
Shaun P. Martin, with whom A. William Urquhart, Marshall M. Searcy III, Quinn Emanuel Urquhart Oliver & Hedges, LLP, F. Dennis Saylor, IV, Cheryl R. Brunetti, and Goodwin Procter LLP, were on brief, for appellees.

---

August 14, 2003

---

**TORRUELLA**, **Circuit Judge**.  On behalf of its affiliate Cellco Partnership ("Cellco"), appellant GTE Wireless sought enforcement of a 1996 covenant not to sue that GTE Mobilnet Services Corporation and GTE Corporation (collectively "GTE")[1] made with appellee Cellexis International, Inc. ("Cellexis").[2]  On cross-motions for summary judgment, the district court granted summary judgment for Cellexis, finding that the Settlement Agreement did not reach entities that became GTE affiliates after the execution of the 1996 Agreement.  After extensive consideration, we reverse.

## I.  Background

### A.  Generation of Settlement Agreement

The history of the parties' litigation is complicated by several corporate transmutations.  In April 1996, appellees Cellexis and Freedom Wireless, Inc., sued GTE in the United States District Court for the District of Arizona, claiming that GTE stole its trade secrets by using Cellexis's technology for prepaid cellular telephone service (the "1996 litigation").

Five weeks after filing suit, Cellexis settled with GTE (the "Settlement Agreement").  As part of the Settlement Agreement,

---

[1]   GTE Wireless, Inc. is a wholly-owned subsidiary of GTE Corporation; GTE Corporation, in turn, is a wholly-owned subsidiary of Verizon Communications, Inc.

[2]   Cellexis International, Inc. is now known as Wireless Pathways, Inc.

Cellexis agreed to pay part of GTE's attorneys' fees and to publicly retract prior statements accusing GTE of uncompetitive behavior, theft, fraud, and malice. In return, GTE agreed to drop its claims against Cellexis for malicious prosecution, trade libel, and interference with contractual relations. The Settlement Agreement contained a covenant by Cellexis and its principals not to sue GTE and its affiliates, partnerships, joint ventures, and successors in the future over GTE's use of the same technology. When the Settlement Agreement was signed, Cellexis had a patent application pending with the U.S. Patent and Trademark Office ("Patent Office") for the technology at issue in the suit.

In September 1997, Cellexis sold its rights under the patent application to Freedom Wireless, Inc., ("Freedom") for $750,000. In February 1998, the Patent Office issued the first of two patents ("'067 patent") arising from the patent application, which Cellexis assigned to Freedom under the terms of the 1997 sale of rights. Four months later, in June 1998, Freedom sent a letter to GTE claiming that GTE was infringing the '067 patent. GTE responded that the Settlement Agreement barred any suit against GTE or its affiliates because the patent covered the technology at issue in the 1996 litigation.

On July 27, 1998, GTE Corporation and Bell Atlantic Corporation ("Bell Atlantic") entered into a merger agreement. On September 21, 1999, Bell Atlantic and Vodafone Airtouch PLC agreed

to consolidate their operations.  As part of the agreement, GTE Wireless's operations were assigned to Cellco (a Bell Atlantic subsidiary) at the closing of the GTE/Bell Atlantic merger.  GTE Mobilnet was dissolved on June 21, 2000, and all its assets were distributed to its sole shareholder, GTE Wireless.  The GTE/Bell Atlantic merger was completed July 10, 2000, and GTE Corporation became a wholly-owned subsidiary of Bell Atlantic (now Verizon Communications, Inc. ("Verizon")).  GTE subsidiaries and affiliates together own 55% of Cellco.  Verizon also has the contractual right to appoint a majority of Cellco's Board of Representatives.

### B.  District Court Proceedings

On March 29, 2000, Freedom filed suit in the United States District Court for the Northern District of California accusing several companies, including Bell Atlantic and AirTouch, of infringing Freedom's patent.  The patent action was transferred to Massachusetts federal court.  In December 2000, the Patent Office issued the second patent ("'823 patent") arising from the patent application assigned to Freedom.  Freedom filed an amended complaint in the patent action adding infringement of the '823 patent and naming Cellco as a defendant.

As Cellco answered Freedom's complaint, GTE Mobilnet filed suit against Cellexis, Freedom, and one of Freedom's officers in the United States District Court for the District of Arizona, contending that AirTouch and Bell Atlantic fell under the

definition of GTE Partnerships in paragraph 1.4 of the Settlement Agreement; thus, Freedom could not bring a claim of patent infringement against them. Six days after bringing suit in Arizona, GTE Mobilnet dissolved. GTE Mobilnet attempted to substitute Cellco as plaintiff, stating that Cellco was a successor to GTE Mobilnet and seeking to preliminarily enjoin Freedom from pursuing its patent case against Cellco. The Arizona court denied the motion to substitute and transferred the case to Massachusetts because of its relatedness to the pending patent action.

After transfer to Massachusetts, the district court allowed GTE Mobilnet's motion to substitute GTE Wireless as plaintiff. In its supplemental complaint, GTE Wireless claimed that defendants were in breach of the Settlement Agreement by continuing to pursue Freedom's patent suit against Cellco. GTE Wireless argued that the interest that GTE Wireless took in Cellco in July 2000 made Cellco a GTE Partnership and an intended beneficiary of the Settlement Agreement and that Cellco fell within the definition of GTE as an affiliate. Cellexis argued, inter alia, that the definition of GTE in the Settlement Agreement only included affiliates that were in existence at the time the agreement was executed.

The parties filed cross-motions for summary judgment. Applying Arizona law as the parties contracted, the Massachusetts court denied GTE's proffer of extrinsic evidence and granted

Cellexis's motion for summary judgment, concluding that the Settlement Agreement does not reach entities that became GTE affiliates after May 15, 1996.  GTE Wireless appeals.

## II.  Standard of Review

We review summary judgment decisions de novo, viewing the facts in the light most favorable to the nonmoving party.  <u>Ruiz-Sulsona</u> v. <u>Univ. of P. R.</u>, __ F.3d __ (1st Cir. 2003).  Summary judgment is inappropriate if there is a genuine issue as to any material fact.  <u>Id.</u>

It is undisputed that Arizona law controls.  In Arizona, contract interpretation involves matters of law, and we are not bound by the trial court's interpretation of the language.  <u>See</u> <u>Andrews</u> v. <u>Blake</u>, 69 P.3d 7, 11 (Ariz. 2003).  "A district court's application of the parol evidence rule, an issue of state law, is reviewed under the same de novo standard applied to decisions concerning federal law."  <u>Jinro Am., Inc.</u> v. <u>JR Int'l Corp.</u>, 266 F.3d 993, 998-99 (9th Cir. 2001) (applying Arizona law to a contract dispute).  Where a contract is reasonably susceptible to more than one meaning and evidence exists to support the reading advocated by the nonmovant, an issue of fact is presented that cannot be resolved on summary judgment.  <u>See</u> <u>Taylor</u> v. <u>State Farm Mut. Auto Ins. Co.</u>, 854 P.2d 1134, 1144-45 (Ariz. 1993) (en banc).

### III. Discussion

GTE wishes to enforce Paragraph 7.1 of the Covenant Not to Sue which states:

> Cellexis and the Cellexis Principals hereby covenant and agree that they shall not now or at any time in the future bring any Claims against GTE, the GTE Partnerships,[3] their predecessors, their successors, and each of their present and former attorneys, officers, agents, heirs, assigns, owners, servants, directors, employees, and all other representatives involving alleged Intellectual Property as defined in paragraph 1.7.

Our task is to determine whether the district court correctly resolved on summary judgment that the language in the Settlement Agreement was "so one-sided that no reasonable person could decide" that the definition of "GTE" in the Settlement Agreement included Cellco, a current GTE affiliate that was not an affiliate at the time the Settlement Agreement was executed. See Lohnes v. Level 3 Communs., Inc., 272 F.3d 49, 53 (1st Cir. 2001) (citation omitted).

We begin our analysis by scrutinizing the contract language for the parties' intent. The definition of "GTE" provided in Paragraph 1.3 of the Settlement Agreement states that "'GTE' means and includes GTE Corporation, all of its subsidiaries, joint

---

[3] Paragraph 1.4 states, "'GTE Partnerships' means and includes all partnerships engaged in the provision of wireless communication services, including but not limited to wireless communication carriers, of which GTE Corporation or any of its subsidiaries or affiliates are a partner or have an ownership or other financial interest."

ventures, and affiliates and every GTE entity which is licensed to provide wireless communications services, including but not limited to GTE Mobilnet Service Corporation."

GTE contends that Paragraph 1.3 does not contain a temporal limitation. In support of its position, GTE attempted to introduce into evidence the deposition of GTE general counsel, Richard Stimson, who testified that he and Cellexis's attorney had agreed not to include a list of GTE entities because the entities were always changing as GTE attempted to establish itself as a national cellular carrier. The district court denied admission of the extrinsic evidence and found that other provisions of the Settlement Agreement contain language in the future tense, indicating that the drafters of the contract would have used a future tense if they intended to include future affiliates.[4] The district court concluded that where the contract did not explicitly use future language, the court will "presume that the parties intended the Agreement to cover only those entities that existed at the time of the Agreement's execution." GTE Wireless, 2002 U.S. Dist. LEXIS, at *14.

---

[4] The district court points to the use of the phrase "arising out of" in Paragraph 1.7 ("'Intellectual Property' means rights, including but not limited to patents, copyrights, or trade secrets, involving or arising out of wireless communication technology . . . .) and the explicit use of the term "successor" in Paragraph 7.1 to reach the conclusion that the drafters used the future tense when they intended to cover future events and entities.

We find that the district court erred in its approach to interpreting the contract. The district court believed that it was required to interpret the Agreement narrowly, and that this narrow construction could not be broadened by any extrinsic evidence, even if that evidence compelled a broader interpretation. See id. at *16. However, this is not Arizona law. When the extrinsic evidence supports GTE's proffered and reasonable interpretation, a triable issue of fact is created that cannot be resolved by a court on summary judgment.

In Arizona, "[w]hen interpreting a contract, a court must determine and effectuate the intent of the parties." Ahwatukee Custom Estates Mgmt. Assoc., Inc. v. Bach, 973 P.2d 106, 109 (Ariz. 1999). To ascertain intent, Arizona has adopted the Corbin approach to the admission of extrinsic evidence. Taylor, 854 P.2d at 1138. Under this approach, the trial judge is not required to make a finding of ambiguity; the court considers all extrinsic evidence offered by a party to "illuminate the meaning of the contract language, or demonstrate the parties' intent." Id. at 1139. The district court erred, then, in holding that GTE's proffered interpretation needed to rest on some "ambiguity as to the temporal limitations in the Agreement." GTE Wireless, 2002 U.S. Dist. LEXIS 16203, at *16. At the interpretation stage, a court may only disregard that evidence that is wholly without

probative value in determining that intent.  <u>Taylor</u>, 854 P.2d at 1139.

In Arizona, "a court may consider surrounding circumstances, including negotiation, prior understandings, and subsequent conduct." <u>Id.</u> After considering all proffered evidence and arriving at an interpretation of the disputed terms, the court excludes from the fact-finder's consideration only the evidence that contradicts or varies the meaning of the agreement. <u>See</u> <u>id.</u> (stating that the judge may not consider the offered evidence where "the asserted meaning of the contract language is so unreasonable or extraordinary that it is improbable that the parties actually subscribed to the interpretation asserted by the proponent of the extrinsic evidence"). Thus, if the trial court finds the contract language is "reasonably susceptible" to the proponent's interpretation, the extrinsic evidence is admissible to determine the parties' intended meaning. <u>Id.</u>; <u>Maxwell</u> v. <u>Fid. Fin. Servs.</u>, 907 P.2d 51, 61 (Ariz. 1995) (en banc).

After correctly reciting Arizona law regarding the admission of extrinsic evidence, the district court overstated Arizona law by asserting it "requires that a release of liability be construed narrowly against coverage of non-parties, unless expressly named or otherwise identified." <u>GTE Wireless</u>, 2002 U.S. Dist. LEXIS 16203, at *11 (citing <u>Spain</u> v. <u>Gen. Motors Corp.</u>, 829 P.2d. 1272, 1273 (Ariz. App. Div. 2 1992)). <u>Spain</u> actually uses

the language relied upon by the district court to discuss the rule other jurisdictions have applied to the rights on non-parties under release contracts. 829 P.2d at 1273. The correct rule to be gleaned from Spain is that others are "released only if that was the intended result or the release expressly provided." Id. (emphasis added).

Independently of its error about the extrinsic evidence, the district court erred in ruling that the language of the Agreement alone was not reasonably susceptible to different interpretations. We think the Agreement offers ample room for different interpretations, including the one offered by GTE. We think the most natural reading of Paragraph 1.3 is that it contains no temporal limitations, encompassing at any given time those entities of which GTE consists or is affiliated with through partnership or other agreements. Another reading, focused on the use of the present tense in the term "is licensed to provide," suggests that the covenant is limited to those entities as of the date of the covenant, the time of execution, or both.

As the district court noted, GTE's extrinsic evidence supported a reasonable belief that GTE wanted to prevent Cellexis from harassing it again with frivolous lawsuits over the claimed intellectual property. That testimony apparently formed the basis for the district court's conclusion that there was "no doubt that GTE desired a broadly worded agreement to protect its interests to

-11-

the greatest degree possible." See 2002 U.S. Dist. LEXIS 16203, at *16. Since we cannot find where Cellexis has ever directly rebutted this testimony or offered evidence to the contrary, we do not see how GTE's "asserted meaning of the contract language is so unreasonable or extraordinary that it is improbable that the parties actually subscribed to the interpretation asserted by the proponent of the extrinsic evidence." Taylor, 854 P.2d at 1139.

Although ostensibly grounded in Federal patent policy, the district court also erred when it rejected GTE's interpretation (and consequently GTE's extrinsic evidence) because GTE's construction of the agreement would be against public policy as an unreasonable expansion of the protections afforded by the Settlement Agreement.[5] GTE Wireless, 2002 U.S. Dist. LEXIS, at *16-17. The trial court's concern about potential abuse is misplaced; the paramount purpose of contract interpretation under Arizona law is to effectuate the parties' intent. Taylor, 854 P.2d at 1139; see also Stephen F. Ross and Daniel Tranen, The Modern Parol Evidence Rule and Its Implications for New Textualist

---

[5] "To afford protection under the Settlement Agreement to any entity that at some point qualifies as a GTE affiliate, joint venture, partnership, or other protected entity, would essentially give the plaintiff a right to infringe Freedom's patent in perpetuity . . . render[ing] the Agreement tantamount to a freely assignable license to Freedom's intellectual property. . . . Absent any evidence showing that the parties agreed to this result, I am disinclined to grant the plaintiff such a broad, and potentially lucrative, construction of the Agreement." GTE Wireless, Inc., 2002 U.S. Dist. LEXIS 16203, at *16-17.

<u>Statutory Interpretation</u>, 87 Geo. L.J. 195, 203-04 (1998) (stating that "because [extrinsic] evidence more accurately reflects the parties' manifest intent than the judge's 'objective' review," Corbin's approach promotes the integrity of the contract as a means of allowing parties the freedom to effectuate their economic goals). The district court misapplied Arizona law when it substituted its views as to what constitutes an improvident contract for that of the contract drafters. As the Arizona Supreme Court has stated, "[t]he judge . . . must avoid the often irresistible temptation to automatically interpret contract language as he or she would understand the words. This natural tendency is sometimes disguised in the judge's ruling that contract language is 'unambiguous.'" <u>Taylor</u>, 854 P.2d at 1139.

In Arizona, extrinsic evidence is not barred even where the trial court believes the contract language is express. <u>Taylor</u>, 854 P.2d at 1139 (stating that "a court is obligated to enforce the agreement according to the parties' intent, even if the language ordinarily might mean something different"). Even a document that may appear plain on its face, "may not appear nearly so plain once the judge considers the [extrinsic] evidence." <u>Id.</u> at 1140. Thus, if the terms of the Settlement Agreement can be reasonably construed in more than one manner, then the terms are "subject to a determination by the trier of fact about the intent of the parties based on extrinsic evidence." <u>Leo Eisenberg & Co.</u> v.

<u>Payson</u>, 785 P.2d 49, 52 (Ariz. 1989) (en banc).  As the district court stated, it is beyond doubt that GTE desired a broadly worded agreement.  GTE wished to be released from  substantial potential liability.  The district court erred by not considering Stimson's testimony and admitting it for consideration by the fact-finder. The imprecise contract language defining GTE in Paragraph 1.3 is reasonably susceptible to GTE's interpretation that the parties intended the Settlement Agreement to cover future affiliates.  A perusal of the recitation of facts in this case supports the assertion that the composition of companies in this industry is constantly changing.

Based on the procedural history and extrinsic evidence there are conflicting reasonable interpretations of the contract language.  These conflicting interpretations create a triable issue of fact that requires the fact-finder to determine whether the parties intended to include future affiliates within the definition of GTE.

## IV.  Conclusion

Consequently, we <u>reverse</u> the trial court's grant of summary judgment and <u>remand</u> this case for further proceedings consistent with this opinion.

**<u>Reversed and Remanded</u>**.