**Melodee WHITMAN, Plaintiff,**

**v.**

**Rick MILES, Defendant.**

**No. CIV. 03–61–P–H.**

United States District Court,
D. Maine.

Nov. 20, 2003.

R. Terrance Duddy, Kelly, Remmel & Zimmerman, Portland, ME, for Melodee Whitman, Plaintiff.

Leonard W. Langer, Tompkins, Clough, Hirshon & Langer, Portland, ME, for Rick Miles, Defendant.

## DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

HORNBY, District Judge.

Under ancient maritime law principles, a sailor who is injured or becomes sick while in the service of the ship has a right to "maintenance and cure" (living and medical expenses) from the ship owner until the sailor is cured or until the illness or injury is diagnosed as permanent and incapable of being improved.[1] This protection developed in simpler times when treatment for the injuries and illnesses sailors confronted was generally neither lengthy nor complex. But modern medicine has devised measures to keep people alive in the face of incurable illness, or at least to alleviate a portion of their suffering—sometimes by heroic measures, sometimes by treatment that runs into years, sometimes with medications that are experimental, expensive or both. What, then, do maintenance and cure mean in the 21st century? The question in this case is how far maintenance and cure extend for a sailor diagnosed with multiple sclerosis, who wants continuing treatment. In the face of uncontested evidence that multiple sclerosis is incurable and that the sailor was as improved as possible on August 15, 2000, I conclude that the ship owner's obligation of maintenance and cure ended on that date, although the sailor in question obviously needs continuing medical treatment. After oral argument on November 5, 2003. I GRANT IN PART the ship owner's motion for summary judgment.[2]

### FACTS

On the ship owner's motion for summary judgment, I rely on uncontested facts or the sailor's version if in conflict. The defendant, Rick Miles, owned the schooner *Timberwind.* Pl.'s Statement of Material Facts ("SMF") ¶ 8. The plaintiff, Melodee Whitman, was assistant cook onboard *Timberwind* in July of 2000. Pl.'s SMF ¶ 9; Def.'s SMF. ¶ 1. On July 17, 2000, Whitman went to the hospital after falling several times on board the ship and experiencing symptoms that included fatigue, loss of balance, numbness, and incontinence. Pl.'s SMF ¶ 3; Def.'s SMF ¶ 2. On July 18, 2000, following an MRI, physicians declared that Whitman's condition was consistent with advanced multiple sclerosis ("MS"). Def.'s SMF ¶ 3. MS is an autoimmune disease recognized as incurable, but not fatal. Pl.'s SMF ¶¶ 28–30; Pl.'s Mem. at 1, 3. Miles, through his insurer, paid Whitman's medical bills for the emergency and initial diagnostic treatment ($6,604.85), but not for any treatment or living expenses after the diagnosis. Def.'s SMF ¶ 28. For at least one month after her discharge from the hospital, Whitman lived with a friend and did not pay rent. Def.'s SMF ¶ 25.

On August 3, 2000, Whitman saw Dr. Judd Jensen for a follow-up. Dr. Collins' Aff., Ex. 3 at 14.[3] In his summary of the

---

1. A famous Maine case where Justice Story sat as circuit justice is often cited for the doctrine. *Harden v. Gordon,* 11 F. Cas. 480 (No. 6047) (C.C.D.Me.1823).

2. The plaintiff sought "past and ongoing maintenance and cure" (Count I), and attorney fees on the basis that the ship owner's denial of maintenance and cure was unreasonable and based on an inadequate investigation (Count II).

3. At oral argument, questions arose concerning Whitman's condition on various dates. The lawyers thereafter submitted for the court the complete medical record exhibit to Dr. Collins' deposition (exhibit 3), which was for some reason incomplete when the deposition was filed.

visit, Dr. Jensen said that Whitman's extremities were still a little numb, but "not as much as they were," her balance was "good," and she was not experiencing incontinence. *Id.* He reported that Whitman said, "I feel back to myself." *Id.* Dr. Jensen also noted "significant subjective and objective improvement in Ms. Whitman's neurologic status since her presentation in the emergency room on July 17," and reiterated that the MRI findings "seemed strongly suggestive" of MS. *Id.*

On August 15, 2000, Whitman saw Dr. Howard Weiner, an MS specialist, for an evaluation. Dr. Collins Aff., Ex. 3 at 15. He described her initial symptoms and MRI as "classic for multiple sclerosis." Dr. Weiner's neurologic examination on August 15 showed that Whitman by then had "a normal gait" and had "no other motor, cerebellar, or sensory findings." *Id.* Dr. Weiner noted that after her hospitalization, Whitman was treated with steroids for five days. She "has subsequently resolved to the extent that she now is continent and only has some mild and tingling feelings," he reported. *Id.*

Shortly after the August 15 evaluation, Whitman began taking Betaseron, an experimental drug designed to alter the abnormal immune systems of MS patients. Pl.'s SMF ¶¶ 4, 17. On October 4, 2000, Whitman returned to Dr. Jensen and complained that she had been experiencing numbness and loss of balance for the past week. Dr. Collins Aff., Ex. 3 at 16. In his summary of the October 4 visit, Dr. Jensen noted that "[p]rior to one week ago [Whitman] felt completely back to normal from her previous bout of neurologic symptoms." *Id.* He predicted that Whitman was suffering from a "mild, early exacerbation" and proscribed Solu–Medrol to treat the exacerbation. *Id.* When Whit-

man visited Dr. Jensen again, on November 17, 2000, he said that her " 'minor exacerbation' resolved in a couple of days" and that Whitman was no longer experiencing any numbness or balance problems. *Id.* at 17. He further reported: "Ms. Whitman appears to be doing quite well from the point of view of her [MS]. Her neurologic examination seems essentially normal at this time and she is asymptomatic." *Id.*

MS manifests itself in sporadic and unpredictable exacerbations, which die down and flare up periodically. Def.'s SMF ¶ 8. Since July, 2000, Whitman has had a number of such episodes, Def.'s SMF ¶ 9, and has experienced symptoms including vision problems, memory loss, dizziness, lightheadedness, nausea, vomiting, worsening bladder and bowel control problems, numbness, partial paralysis to one side of her face, leg spasms, and persistent foot drop. Def.'s SMF ¶ 12. Not all of these symptoms have worsened, and some have disappeared. Pl.'s SMF ¶ 32. The most recent episode was in November, 2002. Pl.'s SMF ¶ 6. Whitman also suffers from depression, and she takes an antidepressant medication daily. Pl.'s SMF ¶ 2.

Although Whitman has not responded well to Betaseron, Pl.'s SMF ¶ 22, she continues to take the drug by injection every other day. Pl.'s SMF ¶ 2. If she were to stop taking Betaseron or a comparable drug, her symptoms would become worse and the onset of greater disability would accelerate. Pl.'s SMF ¶ 26.

When Whitman's treating physician, Dr. Tenser, last saw her after the November 2002 exacerbation, he noted that while the symptoms from that episode had not cleared up completely, she showed neurological improvement since the exacerbation.[4] Pl.'s SMF ¶ 16.

---

4. When Dr. Tenser said that Whitman had "improved," he was speaking of improvement from her last exacerbation, not overall improvement of her condition. Dr. Tenser Dep. at 30.

When Dr. Tenser was deposed on July 30, 2003, he testified that it is unlikely that Whitman will improve further.[5] Def.'s SMF ¶ 19. Dr. Collins, an MS specialist selected by the defendant, was deposed on August 12, 2003. He testified that, based on his review of Whitman's medical records, he believed it is probable that her condition will continue to deteriorate over time.[6] Def.'s SMF ¶ 17.

The goal of continuing Whitman's treatment is to arrest or slow down the progression of the MS, Pl.'s SMF ¶ 35, or to stabilize or reverse her symptoms. Pl.'s SMF ¶ 38. MS is not curable. Pl.'s Resp. to Def.'s SMF ¶ 6.

### ANALYSIS

### (1) Maintenance and Cure Generally

Maintenance and cure are the unique obligations that ship owners owe sailors who fall ill or become injured while in the service of a ship. Neither fault nor causation is required. If a sailor is injured or becomes ill while in the service of the ship, the ship owner has an absolute duty to pay for the sailor's food and lodging (maintenance) as well as any necessary medical expenses (cure) during the sailor's recovery. *LeBlanc v. B.G.T. Corp.*, 992 F.2d 394, 397 (1st Cir.1993). "In the service of the ship" means that the sailor was "answerable to [the ship's] call to duty"

when he or she fell ill or was injured. *Farrell v. United States*, 336 U.S. 511, 516, 69 S.Ct. 707, 93 L.Ed. 850 (1949). Maintenance and cure were fashioned to protect sailors who historically faced hazardous conditions from the sea, pirates and foreign ports. *See Calmar v. Taylor*, 303 U.S. 525, 528, 58 S.Ct. 651, 82 L.Ed. 993 (1938). The Supreme Court has explained the policies behind the obligation:

> The ship owner's ancient duty to provide maintenance and cure for the seaman who becomes ill or injured while in the service of the ship derives from the "unique hazards (which) attend the work of seamen" and fosters the "combined object of encouraging maritime commerce and assuring the well-being of seamen."

*Vella v. Ford Motor Co.*, 421 U.S. 1, 3–4, 95 S.Ct. 1381, 43 L.Ed.2d 682 (1975)(quoting *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 727, 63 S.Ct. 930, 87 L.Ed. 1107 (1943)). The protection was crafted in such a way as to be "so inclusive as to be relatively simple, and [so that it] can be understood and administered without technical considerations. It has few exceptions or conditions to ... invite litigation." *Farrell*, 336 U.S. at 516, 69 S.Ct. 707; *Vella*, 421 U.S. at 4, 95 S.Ct. 1381. But there are limits; it does not amount to lifetime insurance. *Farrell*, 336 U.S. at

---

5. Dr. Tenser said that he believes MS patients can generally stop taking their medications once they are stabilized and stop experiencing exacerbations, which he says can take 10–15 years. Pl.'s SMF ¶ 23. Miles objects to this opinion, arguing that it is inadmissible under *Daubert* because Dr. Tenser admitted during his deposition that his belief is not supported in the medical literature. Def.'s Resp. to Pl.'s SMF ¶ 23. Although support in the medical literature is just one of several factors that *Daubert* directs courts to consider, it is unclear whether Dr. Tenser's opinion that MS patients can eventually stop taking medication is grounded in science at all. Of his opinion, Dr. Tenser said, "This is my own

idea, thinking." Dr. Tenser Dep. at 37. Because his opinion on this matter does not appear to offer scientific knowledge, it is inadmissible under *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 593, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("The subject of an expert's testimony must be 'scientific ... knowledge.' ").

6. Dr. Collins also said that there is another class of drugs, aside from the Betaseron that Whitman is currently taking, that he would prescribe for her if she was under his care. Pl.'s SMF ¶ 34. According to Dr. Collins, a successful response to these drugs would be stabilization. *Id.*

519, 69 S.Ct. 707. Early cases debated whether the obligation continued after the voyage had ended, *e.g., McCarron v. Dominion Atlantic R. Co.,* 134 F. 762 (D.Mass.1905), but it has long been clear that there is no long term obligation for an incurable disease or chronic illness, *Calmar,* 303 U.S. at 528, 58 S.Ct. 651, and, in accordance with the Shipowners' Liability Convention, that the protection lasts only until the sailor "is so far cured as possible."[7] *Farrell,* 336 U.S. at 518, 69 S.Ct. 707 (citing *The Wensleydale,* 41 F. 829 (E.D.N.Y.1890)); *accord Vella,* 421 U.S. at 6 n. 5, 95 S.Ct. 1381 (quoting *Desmond v. United States,* 217 F.2d 948, 950 (2d Cir. 1954) ("only until the disease is cured or recognized as incurable.")).[8]

Whitman and Miles agree that Whitman was diagnosed with MS in July, 2000.

They disagree, however, about whether or when Whitman's MS was diagnosed "permanent" and "incapable of being improved." Whitman argues that her condition is not permanent because, although the underlying MS will not improve, she will benefit from further treatment. In the alternative, she urges me to find that her condition was not declared permanent until July of 2003, when Miles deposed Dr. Tenser, her treating physician, and obtained an explicit statement that further improvement in Whitman's condition is unlikely. Miles argues that Whitman's MS was permanent and incapable of improvement upon diagnosis. At oral argument he conceded, however, that maintenance and cure extend for a short period of time after the diagnosis to cover initial treatment necessary to stabilize Whitman. Miles suggests the August 15 visit with Dr. Weiner as the appropriate end-point.[9]

---

7. The United States is a party to the Shipowner's Liability Convention, which was drafted in 1936 at the General Conference of the International Labor Organization at Geneva. The Convention was ratified by the Senate and proclaimed effective for the United States by President Roosevelt in 1939. 54 Stat. 1693; *Farrell v. United States,* 336 U.S. 511, 517, 69 S.Ct. 707, 93 L.Ed. 850 (1949). Article 4 of the Convention provides that "[t]he shipowner shall be liable to defray the expense of medical care and maintenance until the sick or injured person has been cured, or until the sickness or incapacity has been declared of a permanent character." This language controls the modern scope of maintenance and cure. In *Farrell v. United States,* 336 U.S. 511, 517, 69 S.Ct. 707, 93 L.Ed. 850 (1949), however, the United States Supreme Court said that the Convention did not alter the doctrine of maintenance and cure, but was declaratory of the existing law. *Id.* at 517, 69 S.Ct. 707. At the time the Convention was enacted, the law was that maintenance and cure ceased when the sailor was "so far cured as possible." *Id.* Therefore, "permanent" as used in the Convention does not mean "permanent" merely in the limited sense that the underlying illness or injury will never go away, but also means that the condition is "so far cured as possible" ("maximum cure").

8. *Desmond* also says: "If the seaman thereafter needs attention to maintain his improvement at the maximum, to assist him in recovering from relapses, or to restrain the progress of the disease, the ship owner is not bound to provide that." 217 F.2d at 950 (quoting *Muruaga v. United States,* 172 F.2d 318, 321 (2d Cir.1949)).

9. In conceding that maintenance and cure continued for a short time after Whitman's MS was diagnosed, Miles relied on *Calmar v. Taylor,* 303 U.S. 525, 530, 58 S.Ct. 651, 82 L.Ed. 993 (1938). In *Calmar,* the United States Supreme Court held that, in the case of an incurable illness, maintenance and cure extend for "a fair time after the voyage in which to effect such improvement in the seaman's condition as reasonably may be expected to result from nursing, care, and medical treatment." Shortly after the Court's holding in *Calmar,* however, the United States became a party to the Shipowner's Liability Convention, described in note 8, *supra.* In *Farrell v. United States,* 336 U.S. 511, 518, 69 S.Ct. 707, 93 L.Ed. 850 (1949), the Court said that the Convention controlled and that maintenance and cure continue until the sailor is "so far cured as possible." I conclude that the concept of "maximum cure" thereby replaced *Calmar's* "reasonable time" test. Because Miles has conceded that he is liable for main-

## (2) What is "Permanent"?

■ Whitman asserts that her condition is not permanent because, without treatment, her clinical course would have been worse; and if treatment is discontinued, her condition will decline more rapidly. Pl.'s SMF ¶ 42. She also asserts that the goal of her treatment is to arrest or to slow the progression of MS. *id.* ¶ 25, and that a new generation of drugs can cause MS "either to arrest, plateau or slow down," Pl.'s Mem. at 1, 3, 16 (notably, not improve). She argues that "[w]hile multiple sclerosis is incurable and the *diagnosis* of [MS] is permanent, the disease itself is treatable with 'disease modifying drugs' which work at the cellular level to modify the immune system with the goal of arresting the disease or at least slowing its progress." Pl.'s Resp. to Def.'s SMF ¶ 6. Clearly medical treatment is beneficial and even necessary to Whitman. But maintenance and cure as developed in maritime

law and in the Shipowner's Liability Convention do not extend as far as Whitman would like. Slowing or arresting a decline, while medically important, simply is not the same as effecting an improvement, the standard for maintenance and cure. As the Supreme Court has said, "maintenance and cure is more certain if more limited in its benefits. It does not hold a ship to permanent liability for a pension ...." *Farrell,* 336 U.S. at 519, 69 S.Ct. 707.

■ Whitman has not offered any facts from which I could find that her condition was capable of being improved after August 15, 2000, when her doctor reported that she was "resolved" and experiencing only mild tingling.[10] Although Whitman needs continuing medical treatment and care, as a sailor she is not entitled to maintenance and cure once the "disabling condition 'has been found to be permanent and incapable of being improved.'" *Hubbard,* 626 F.2d 196, 201 (1st Cir.1980).[11]

tenance and cure until August 15, 2000, however, I will assume that his duty did not end any earlier than that date.

10. Whitman argues that her MS treatment is not "palliative," but rather is a "betterment" to her in the sense that stopping the medications "would cause an increase in symptoms and speed overall disability." Pl.'s Mem. at 2; Pl.'s SMF ¶ 42 (clinical course without treatment would have been worse). In concluding that the undisputed facts show that Whitman reached the point of maximum cure on August 15, 2000, I do not attempt to resolve the debate over what forms of treatment are "palliative" or result in a "betterment." *E.g., Vella,* 421 U.S. at n. 4, 95 S.Ct. 1381; *Hubbard,* 626 F.2d at n. 4. I simply conclude that Whitman has not shown that the goal of her treatment is to improve her condition. In her statement of material facts, Whitman also says that she suffers from depression, which is curable. If Whitman is arguing that she should recover depression-related expenses because depression is a symptom of her MS, my conclusion that her MS reached "maximum cure" on August 15, 2000 controls. If she is suggesting that de-

pression is a distinct affliction that she began suffering while in the service of the ship, giving rise to its own maintenance and cure obligation, she has failed to provide any evidence that she was answerable to the call of the ship when she began suffering from depression. There is actually some suggestion in Whitman's medical records that her depression pre-dated her MS diagnosis. Dr. Collin's Aff., Ex. 3 at 15 (On August 15, 2000, Dr. Weiner reported: "[Whitman] does mention that in the past she was on an antidepressant.").

11. At oral argument, Whitman's counsel argued that I should read "condition" to refer to each individual manifestation of MS, not the MS itself. He argued that maintenance and cure should continue as long as medication might improve one of Whitman's deficiencies, regardless of the fact that other symptoms were getting worse and new symptoms were manifesting themselves. The Convention says that maintenance and cure continue until the "sickness or incapacity" is declared permanent; and the cases often refer to the sailor's "condition." *E.g., Hubbard,* 626 F.2d at 201; *Pelotto v. L & N Towing Co.,*

### (3) When is it "Permanent"?

■ Whitman argues alternatively that Miles must pay maintenance and cure until Dr. Tenser stated explicitly at his July 2003 deposition that her condition was not going to improve. For authority she relies on cases holding that maintenance and cure continues until a doctor *diagnoses* the sailor's condition as permanent, regardless of whether the condition was in fact permanent long before the diagnosis. *Vella v. Ford Motor Co.*, 421 U.S. 1, 4–5, 95 S.Ct. 1381, 43 L.Ed.2d 682 (1975); *Hubbard v. Faros Fisheries*, 626 F.2d 196, 202 (1st Cir.1980). The rationale behind requiring a doctor's diagnosis of permanency is that physicians, not ship owners or insurance claim adjusters, are in the best position to determine whether a sailor has reached maximum medical recovery. *See Vella*, 421 U.S. at 4–5, 95 S.Ct. 1381.

■ The Third Circuit has recognized that there can be a factual dispute over when a diagnosis of permanence was made. *Cox v. Dravo Corp.*, 517 F.2d 620, 627 (3d Cir.1975). That is not the situation here, however. Although the talismanic legal words were not used, it is undisputed that MS is incapable of being improved through treatment and undisputed that Whitman has been diagnosed with MS since July 2000. The record also shows that by August 15, 2000, a doctor found that Whitman had "resolved" since her July hospitalization and was experiencing only mild tingling. That is enough. To require a doctor or diagnosis to use particular words like "permanent" or "incapable of being improved" would elevate form over substance. While these terms have legal significance, they may not have medical significance; putting words in doctors' mouths does not serve the policies behind the doctrine of maintenance and cure. I conclude that when a person has previously been diagnosed with a disease that is undisputedly permanent, Dr. Weiner's note of August 15 meets the *Vella* standard for medical diagnosis of maximum cure.[12]

### CONCLUSION

I conclude that Whitman was undisputedly diagnosed with a permanent condition and that her doctor described her as having reached maximum cure by August 15, 2000. On that date, Miles's obligation to provide maintenance and cure ended. At

604 F.2d 396, 400 (5th Cir.1979). Cognizant of the ambiguity inherent in these terms, I use "condition" here for the sake of clarity. I agree that "condition" encompasses more than the underlying disease or injury. Otherwise, a sailor who lost a limb (permanent) would not be entitled to the medical treatment necessary to stop the bleeding and heal the wound. This case does not require me to define "condition" with precision, however. Regardless of how I read "condition," it is inescapable that neither Whitman's MS nor the manifestations of the MS (symptoms) were capable of being improved after August 15, 2000. Further treatment may have prevented old symptoms from recurring or slowed the onset of new symptoms, but it could not make her "better" than she was at that point in time. *See Pelotto*, 604 F.2d at 400 ("The accepted legal standard holds that maximum cure is achieved when it appears probable that further treatment will result in no betterment of the seaman's condition.").

12. Whitman was still experiencing mild tingling on August 15, 2000. She was not, therefore, entirely symptom-free. Later, however, Whitman's condition declined as she suffered problems with balance and numbness. Dr. Collins' Aff., Ex. 3 at 16. The fact that Whitman's condition declined after August 15 bolsters the conclusion that she was at her point of peak recovery on that date. (On October 4, 2000, Dr. Jensen reported that "[p]rior to one week ago [Whitman] felt completely back to normal from her previous bout of neurologic symptoms." *Id.*). If there is any question about that date, however, Dr. Jensen's notes show that the date can be no later than November 17, 2000. On that day, after recovering from an exacerbation, Whitman was "asymptomatic." *Id.* at 17.

oral argument, Miles agreed to pay for medical expenses (cure) that Whitman incurred between July 18, 2000, and August 15, 2000. Maintenance encompasses both food and lodging. Because Whitman did not pay rent during this time, Miles is not obligated to pay for her lodging. The record does not contain any evidence regarding whether Whitman paid for food after she was released from the hospital. The summary judgment does not, therefore, encompass food expenses that Whitman incurred after her release from the hospital and until August 15, 2000. Accordingly, I GRANT to the defendant, Rick Miles, partial summary judgment on Count I of the Complaint, namely as to all maintenance and cure after August 15, 2000, and for lodging expenses in their entirety.

■ Although Miles is responsible for an additional month of Whitman's medical and food expenses, his refusal to pay beyond the date of her diagnosis was not "callous, willful, or recalcitrant," as the cases require for an attorney fee award. *Robinson v. Pocahontas,* 477 F.2d 1048, 1051 (1st Cir.1973). Therefore, the defendant's motion for summary judgment on Count II is GRANTED.

Counsel shall notify the court within 30 days whether there is any remaining dispute on Count I or whether final judgment can be entered.

This decision does not prevent Whitman from seeking maintenance and cure in the future, should improvement in her condition become possible. *See Myers v. Isthmian Lines, Inc.,* 282 F.2d 28, 32 n. 4 (1st Cir.1960); *Farrell,* 336 U.S. at 519, 69 S.Ct. 707. *See also Costa Crociere v. Rose,* 939 F.Supp. 1538, 1556–57 (S.D.Fla.1996).

So ORDERED.