# United States Court of Appeals

## For the First Circuit

---

No. 04-1117

MELODEE WHITMAN,

Plaintiff, Appellant,

v.

RICK MILES,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

---

Before

Boudin, Chief Judge,

Torruella and Dyk[*], Circuit Judges.

---

R. Terrance Duddy, with whom Jennifer A. Archer and Kelly, Remmel & Zimmerman, were on brief, for appellant.
Leonard W. Langer, with whom Marshall J. Tinkle and Tompkins, Clough, Hirshon & Langer, P.A., were on brief, for appellee.

---

October 28, 2004

---

[*] Of the Federal Circuit, sitting by designation.

**TORRUELLA**, **Circuit Judge**.  In this case involving a claim for maintenance and cure benefits by a seaman suffering from multiple sclerosis, plaintiff-appellant Melodee Whitman ("Whitman") appeals from an order of the district court granting defendant-appellee Rick Miles's ("Miles") motion for summary judgment.  We affirm.

## I.  Background

We review the entry of summary judgment de novo, viewing the facts in the light most favorable to the party opposing summary judgment, in this case Whitman.  GTE Wireless, Inc. v. Cellexis Int'l, Inc., 341 F.3d 1, 4 (1st Cir. 2003).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

On July 17, 2000, while working as a cook on Miles's ship, the S/V Timberland, Whitman had to be driven to a hospital after falling several times on the ship, burning herself while cooking, and experiencing other symptoms including fatigue, cold, numbness, and incontinence.  Following an MRI, Whitman was diagnosed with multiple sclerosis ("MS"), an autoimmune disease that causes a person's immune system to attack healthy tissue in the body.  Whitman has what is known as "relapsing-remitting" MS,

which is characterized by symptoms that manifest themselves in sporadic, unpredictable exacerbations that flare up and then die down. Sometimes the symptoms completely clear; other times they do not. While not fatal, MS is a permanent disease with no known cure.[1]

On August 3, 2000, Whitman saw Dr. Judd Jensen for a follow-up visit. Dr. Jensen noted significant improvement in Whitman's status since her hospital visit on July 17, 2000. Dr. Jensen also reiterated that the MRI findings were strongly suggestive of MS. On August 15, 2000, Whitman saw Dr. Howard Weiner for an evaluation. Dr. Weiner, an MS specialist, described Whitman's initial symptoms and MRI as classic for MS. After a neurologic examination, Dr. Weiner found that Whitman had a normal gait and there were no other motor, cerebellar, or sensory findings. He also found that Whitman was continent and only had some mild tingling feelings.

Shortly after Dr. Weiner's August 15 evaluation, Whitman began taking Betaseron, a disease-modifying medication that acts at the cellular level to alter the immune system's response to MS. On October 4, 2000, Whitman saw Dr. Jensen and complained of numbness and loss of balance. On November 17, 2000, Whitman again visited Dr. Jensen, who noted that the recent exacerbation had resolved in

---

[1] In her brief, Whitman acknowledges that MS is a permanent disease.

a couple of days, that her neurologic examination was essentially normal, and that she was asymptomatic.

Since July 2000, Whitman has had several exacerbations, with symptoms including vision problems, memory loss, dizziness, lightheadedness, nausea, vomiting, numbness, leg spasms, partial paralysis to one side of her face, and foot drop. Some, but not all, of these symptoms have faded or disappeared. Whitman's last exacerbation occurred in November 2002. Whitman also suffers from depression, for which she takes medication. Depression is common among patients with MS.

Through his insurer, Miles paid Whitman's medical bills for her initial diagnosis and treatment. Miles did not pay for any living expenses or treatment after the diagnosis. In August 2000, Whitman spoke by phone with Patrick O'Toole of Acadia Insurance Company, which is Miles's insurer, and requested maintenance and cure benefits. In a letter dated August 21, 2000, Acadia denied Whitman benefits beyond the emergency treatment and initial diagnosis. On March 6, 2003, Whitman filed suit in Maine federal district court, seeking past and ongoing maintenance and cure ("Count I"), as well as attorney's fees for unreasonable refusal to pay maintenance and cure ("Count II"). On August 28, 2003, Miles moved for summary judgment.

Miles originally argued that his duty to provide maintenance and cure ended on July 18, 2000, when Whitman was first

-4-

diagnosed with MS.  At oral argument before the district court, Miles conceded that the duty to provide maintenance and cure extended for a short time after diagnosis, and agreed to pay for Whitman's medical expenses up to August 15, 2000.[2]  On November 20, 2003, the district court partially granted Miles's motion for summary judgment on Count I, finding that August 15, 2000 was the date of maximum medical recovery.  The district court concluded that Miles was entitled to summary judgment for "all maintenance and cure after August 15, 2000, and for lodging expenses in their entirety."[3]  Whitman v. Miles, 294 F. Supp. 2d 117, 125 (D. Me. 2003).  The district court also granted summary judgment on Count II.  This appeal followed.

---

[2]  How the date August 15, 2000 was reached bears mentioning. Miles, relying on Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 530 (1938), conceded that his duty to provide maintenance and cure continued for a reasonable time after diagnosis.  In its decision, the district court noted that the standard in Calmar was superceded by the Shipowner's Liability Convention and found that under the Convention maintenance and cure benefits continue until the sailor is "so far cured as possible".  Farrell v. United States, 336 U.S. 511, 518 (1949).  However, because Miles conceded liability for maintenance and cure until August 15, 2000, the district court assumed that Miles's duty did not end before that date.  The district court, using the test in Farrell, later found that August 15, 2000 was also the date of maximum medical recovery.

[3]  The district court found that, because Whitman lived with a friend and did not pay rent between July 18, 2000 and August 15, 2000, Miles was not obligated to pay for her lodging.

## II. Discussion

### A. Maintenance and Cure

"Maintenance and cure is the traditional form of compensation paid to a seaman who becomes ill or injured aboard a vessel." Richards v. Relentless, Inc., 341 F.3d 35, 40 n.1 (1st Cir. 2003)(citing Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 527-528 (1938)). "The duty of paying maintenance and cure falls to the owner of the vessel." Id. "The term refers to the provision of, or payment for, food and lodging ('maintenance') as well as any necessary health-care expenses ('cure') incurred during the period of recovery from an injury or malady." Ferrara v. A. & V. Fishing, Inc., 99 F.3d 449, 454 (1st Cir. 1996)(quoting LeBlanc v. B.G.T. Corp., 992 F.2d 394, 397 (1st Cir. 1999)(internal quotation marks omitted)). The right to maintenance and cure applies only to "seamen" who are injured or fall ill while "in service of the ship." LeBlanc, 992 F.2d at 396. The right applies until the seaman is "so far cured as possible." Farrell v. United States, 336 U.S. 511, 518 (1949); Ferrara, 99 F.3d at 454.

When a seaman's "condition has stabilized and further progress ended short of a full recovery, the seaman . . . is no longer entitled to maintenance and cure." In re RJF Int'l Corp. for Exoneration from or Limitation of Liab., 354 F.3d 104, 106 (1st Cir. 2004). This point in time is known as the seaman's "maximum medical recovery." Id. at 107 (citing Vaughan v. Atkinson, 369

U.S. 527, 531 (1962). However, treatment that is "more than simply palliative, and would improve [the seaman's] medical condition . . . is enough to support an award of maintenance and cure in aid of permanent improvement short of a complete cure." Id.

### 1. Whether MS Can Be Improved Through Treatment

Whitman first argues that the district court erred in finding that MS is incapable of being improved through treatment. Whitman bases this argument on the fact that she is being treated with Betaseron, a disease-modifying drug that acts at the cellular level to alter the immune system's response to MS. Whitman states that the goals of her treatment include slowing, stabilizing, arresting, or reversing her MS symptoms. Relying on our decision in In re RJF, Whitman argues that this treatment is not palliative and will improve her medical condition.

Whitman's reliance on In re RJF is misplaced. In that case, a seaman suffered severe, permanent brain damage with symptoms including muscle spasticity and contractions. Id. at 106. The seaman's physicians provided evidence that further treatment, including rehabilitation directed in part at the muscle spasms, would lessen the muscle ailments and result in further, although incomplete, cognitive improvement. Id. at 107. Because the evidence showed that further treatment would improve the seaman's underlying condition, we found that the seaman had not reached the

-7-

point of maximum medical recovery and that the shipowner's duty of maintenance and cure continued. Id.

In the instant case, Whitman concedes that her MS is permanent. The question is whether Whitman's treatment would improve her medical condition such that she had not, as of August 15, 2000, reached the point of maximum medical recovery. The testimony of the doctors for both parties leaves no genuine issue of material fact that Whitman's treatment would, at best, slow or arrest the progression of her MS, but would not reverse her symptoms or improve her condition beyond the point of maximum medical recovery.

Dr. Richard Tenser, Whitman's treating physician, testified in his deposition that Whitman's condition had not improved and had probably worsened.[4] Dr. Tenser's testimony also indicated that, at best, he hoped treatment with Betaseron would slow or arrest the progression of Whitman's MS to prevent her from becoming disabled:

> Q. Would you agree with me that it is more likely than not that Ms. Whitman will at some point in the future become disabled from her MS?
>
> A. Again, a tough question. I mean the whole goal of her treatment is to try to prevent that. . .[S]he has pretty severe MS. Whether she will become disabled or not, I

---

[4] While Dr. Tenser discussed improvement, he did so in the context of improvement from Whitman's last exacerbation, not improvement in her overall condition.

-8-

don't know. Obviously using the Betaseron to try to prevent that, so do I want to acknowledge that the medication will fail, I'm reluctant to do that. I would just say that she certainly has a significant chance of becoming disabled.

Moreover, Whitman mentions several times that one of the goals of her treatment is to reverse her symptoms. However, Dr. Tenser never testified that this was the goal of her treatment. Miles's medical expert, Dr. Edward Collins, mentioned "reversing" some of Whitman's symptoms in his deposition testimony, but not reversing the MS itself. Further, Dr. Collins noted that, while he hoped that treatment might reverse certain symptoms of MS, he was not predicting that result. He also later testified that the goal of her treatment was to slow the downward progression of Whitman's MS, and that an upward improvement would not occur.

The testimony of both doctors is very different from In re RJF, where the seaman's doctors opined that further treatment would not merely arrest symptoms of the underlying condition, but would improve the condition itself. Id. Further, in In re RJF, the testimony of the shipowner's doctors left room for the conclusion that further treatment could lead to long-term improvement of the seaman's condition. Id. In the instant case, Dr. Collins explicitly stated that no reversal or upward improvement in Whitman's condition would occur.

In sum, while Whitman's treatment may be necessary and beneficial to her, its benefits relate to slowing or arresting the

-9-

progression of her disease.  We agree with the district court that "[s]lowing or arresting a decline, while medically important, simply is not the same as effecting an improvement . . . ." Whitman, 294 F. Supp. 2d at 123.

### 2.  August 15, 2000

Whitman also argues that the district court erred in finding that she was as improved as possible on August 15, 2000. According to Whitman, the district court should not have found that she was as improved as possible on August 15, 2000, because nothing in the medical record at that time mentioned her condition as being permanent, she had not yet begun her treatment with Betaseron, and she was later asymptomatic on November 17, 2000.

While it may be true that the medical record on August 15, 2000 says nothing about Whitman's condition being permanent, it is  undisputed that Whitman had been diagnosed with MS by August 15, 2000.  By definition, MS is a permanent, incurable disease.  There was no need for a doctor to use the word "permanent" when Whitman's condition was, by definition and concededly, permanent.

Regarding the fact that Whitman had not yet begun treatment with Betaseron on August 15, 2000, both medical experts testified that the goal of the Betaseron was to slow or arrest the progression of MS.  There is no evidence that the goal or even the

hope of the Betaseron treatment was to improve Whitman's condition beyond where it was on August 15, 2000.

Finally, although Whitman was diagnosed in November 2000 as asymptomatic, this diagnosis was made in the context of the most recent exacerbation of her relapsing-remitting MS.[5] Her asymptomatic status on that date does not mean that her overall condition had improved, but merely that the symptoms from her last exacerbation had died down.

Whitman first experienced symptoms in mid-July 2000 and had to be hospitalized. On August 15, 2000, Dr. Weiner found that these symptoms had "resolved," and Whitman began her treatment shortly thereafter. Whitman's medical expert, Dr. Tenser, testified that Whitman has not improved during the course of her treatment. We therefore conclude that Whitman's condition has not improved since August 15, 2000, and that date thus represents a date when Whitman reached the point of maximum medical recovery.

### 3. Depression

Whitman also argues that she suffers from depression as a result of her MS, and that because her depression is curable, she is entitled to maintenance and cure for its treatment. The district court did not determine whether Whitman is arguing that

---

[5] According to Whitman's physician Dr. Tenser, in relapsing-remitting MS, a patient has exacerbations when "[n]eurologic symptoms occur, [that] once again may clear completely or may clear incompletely."

her depression is a symptom of MS or is a separate ailment, instead finding that Whitman would not be entitled to maintenance and cure regardless of which argument she was making.  We agree.[6]

If Whitman's argument is that her depression is a distinct ailment from her MS, giving rise to its own claim for maintenance and cure, then she has failed to produce any evidence that she began to suffer from depression while in the service of the ship, an element on which she would have the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)("[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

The alterative argument that Whitman's depression is a symptom of her MS would not alter her eligibility for maintenance and cure. Our conclusion that August 15, 2000 is the date she reached maximum medical recovery precludes her from maintenance and cure benefits.  Whitman has produced no evidence that she suffered from depression as a symptom of her MS on or before August 15, 2000.  Even assuming that her depression could be cured, it would

---

[6]  Like the district court, we do not address whether depression is a symptom of MS or a distinct illness.

not improve her condition beyond where it was on August 15, 2000, when she was not suffering from depression.[7]

## 4. **Consultation of Whitman's Physician**

Whitman's final argument is that maintenance and cure should have continued until her physicians declared her condition permanent. See Vella v. Ford Motor Co., 421 U.S. 1, 4-5 (1975)(holding that maintenance and cure continues until a seaman's injury is medically diagnosed as permanent); Hubbard v. Faros Fisheries, Inc., 626 F.2d 196, 202 (1st Cir. 1980)(concluding that a seaman "was entitled to maintenance and cure until his physicians diagnosed his condition as permanent"). According to Whitman, Miles's insurance representative, Patrick O'Toole, terminated her maintenance and cure benefits prior to consulting her physicians and without any evidence that Whitman's MS was permanent and incapable of being improved. Whitman argues that the earliest the diagnosis of permanency could have occurred was July 30, 2003, when Miles deposed her doctor.

In Vella, the Supreme Court quoted with approval a Second Circuit decision stating that "[t]he shipowner is liable for maintenance and cure only until the disease is cured or recognized as incurable." Vella v. United States, 421 U.S. at 6 n.5 (quoting

---

[7] We do not address whether curing Whitman's depression would effectuate an improvement in her MS because it is clear that, even if this were the case, Whitman's condition would not improve beyond where it was on August 15, 2000.

Desmond v. United States, 217 F.2d 948, 950 (2d Cir. 1954) (emphasis added)). In the instant case, it is undisputed that, as of August 15, 2000, Whitman was diagnosed by her physicians as having MS, a disease that is by definition recognized as permanent and incurable.[8] In this situation, we do not believe that a physician must use the magic words "permanent" or "incapable of being improved" in a diagnosis. We agree with the district court that such a requirement "would elevate form over substance." Whitman, 294 F. Supp. 2d at 124. By August 15, 2000, Whitman had been diagnosed by her physicians with MS, a condition that is recognized as incurable. Miles's obligation to provide maintenance and cure therefore ended by August 15, 2000.

## B. Attorney's Fees

At trial, Whitman would have the burden of proving that Miles was "callous, willful, or recalcitrant" in withholding maintenance and cure payments. See Robinson v. Pocahontas, Inc., 477 F.2d 1048, 1051 (1st Cir. 1973). The district court found that Miles's refusal to pay maintenance and cure beyond the date of Whitman's diagnosis was not callous, willful, or recalcitrant. See Whitman, 294 F. Supp. 2d at 125. Whitman argues that the district court erred because it failed to determine what Miles's insurance adjuster knew about MS, and from what source, when it terminated

---

[8] We note again that there is no dispute about whether MS is permanent because Whitman herself concedes that MS is a permanent disease.

-14-

Whitman's maintenance and cure benefits in August 2000.[9]  Whitman asks us to remand Count II for a factual determination on this point.  However, it is Whitman who bears the burden at summary judgment of producing evidence that Miles was "callous, willful, or recalcitrant" in denying her maintenance and cure benefits. Whitman has produced no such evidence, and we therefore affirm the district court's grant of summary judgment on Count II.  <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at 322-23.

**<u>Affirmed</u>**.

---

[9]  This argument appears to be based on a belief that, if the district court found that Miles's insurer had not consulted Whitman's doctors or made a thorough examination of Whitman's medical records before terminating maintenance and cure, then Miles would have been callous, willful, or recalcitrant.