# United States Court of Appeals
## For the First Circuit

No. 20-2073

MAGNUS AADLAND,

Plaintiff, Appellant,

v.

BOAT SANTA RITA II, INC.; BOAT SANTA RITA III, INC.;
FRANCIS A. PATANIA; SALVATORE PATANIA, JR.,

Defendants, Appellees,

F/V LINDA,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Barron, Chief Judge,
Thompson and Hawkins,* Circuit Judges.

Scott W. Lang, with whom Catherine Kramer, Lang Xifaras &
Bullard, Andrew B. Saunders, and Saunders & Saunders, LLP were on
brief, for appellant.
Francis McSweeney, with whom Joseph A. Regan and Regan &
Kiely, LLP were on brief, for appellees.

---

* Of the Ninth Circuit, sitting by designation.

July 28, 2022

**BARRON, Chief Judge**.  This appeal concerns a suit that Magnus Aadland brought in the United States District Court for the District of Massachusetts against the owners of a fishing vessel on which he was a seaman.  He alleges that the owners breached a federal common law obligation under admiralty law that is known as the duty of cure.  He contends that they did so by failing to pay him adequately for the costs of the medical care that he received after he fell ill from an infection that he acquired while working aboard their vessel.  He further alleges that, even if the defendants did satisfy their duty of cure through various payments that they made to him and his private health insurer, they so delayed in doing so that he is entitled to compensatory damages for emotional distress, punitive damages, and attorney's fees.  The District Court granted judgment to the defendants after a bench trial.

We vacate the grant of judgment with respect to Aadland's claim that the defendants' breached their duty of cure and remand for further proceedings consistent with this decision.  Our ruling on that score also leads us to vacate the District Court's grant of judgment to the defendants with respect to Aadland's claims for compensatory damages for emotional distress, punitive damages, and attorney's fees for the defendants' alleged delay in fulfilling the duty of cure.  Finally, we reverse the District Court's ruling that Aadland had reached what is known as the "point of maximum

medical recovery," which is a bar to any claim for cure based on the costs of recovery past that point in time.

## I.

The following facts are not contested on appeal. On July 9, 2014, the F/V Linda, owned by Boat Santa Rita II ("BSR II"), Boat Santa Rita III, Frank Patania, and Salvatore Patania, left New Bedford, Massachusetts on a commercial scalloping trip. Aadland was the vessel's captain.

A few days into the trip, while at sea, Aadland fell ill. His condition continued to worsen, and the F/V Linda reversed course and traveled back to Massachusetts. Upon arrival in New Bedford on July 18, 2014, Aadland was transported to a hospital. He was diagnosed with a group G Streptococcus infection.

Aadland spent the next six months at various inpatient facilities, receiving medical treatment at them from July 18, 2014, to December 29, 2014. He was then discharged and received outpatient treatment until July 9, 2015, when he was again admitted to the hospital due to health complications that stemmed from the infection. Aadland was released from this second period of hospitalization on September 10, 2015. He thereafter received outpatient treatment for symptoms attributable to the infection.

It is a general principle of admiralty law that if "a seaman falls sick[] or is wounded[] in the service of the ship," "the vessel and her owners are liable . . . to the extent of [the

seaman's] maintenance and cure." Atl. Sounding Co. v. Townsend, 557 U.S. 404, 413 (2009) (quoting The Osceola, 189 U.S. 158, 175 (1903)). The duty of maintenance and cure is often referred to as a single duty, but there are two distinct aspects of it -- "maintenance" and "cure."

"Maintenance" refers to "the provision of, or payment for, food and lodging." LeBlanc v. B.G.T. Corp., 992 F.2d 394, 397 (1st Cir. 1993). "Cure," by contrast, refers to "necessary health-care expenses . . . incurred during the period of [the seaman's] recovery from an injury or malady." Id.

The duty of maintenance and cure can be traced back centuries to legal codes of several seafaring nations. See Vaughan v. Atkinson, 369 U.S. 527, 532 n.4 (1962); see also 1B Erastus Cornelius Benedict, Benedict on Admiralty § 42 (2022) (explaining that a shipowner's duty to provide maintenance and cure can be found in the Laws of Oleron, which date to approximately the year 1200); 2 Robert Force & Martin J. Norris, The Law of Seamen § 26:6 (5th ed. 2021) (same). The Supreme Court of the United States first formally recognized the duty of maintenance and cure, however, in The Osceola, 189 U.S. 158, 172 (1903).

In doing so, the Court echoed Justice Story's oft-quoted passage in Harden v. Gordon, 11 F. Cas. 480 (C.C.D. Me. 1823). There, he explained that

[s]eamen are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labour. They are generally poor and friendless . . . . If some provision be not made for them in sickness at the expense of the ship, they must often in foreign ports suffer the accumulated evils of disease, and poverty, and sometimes perish from the want of suitable nourishment. Their common earnings in many instances are wholly inadequate to provide for the expenses of sickness.

Id. at 483. Justice Story reasoned there that if the "expenses of his [on-ship] sickness [or injury] are a charge upon the ship, the interest of the owner will be immediately connected with that of the seamen" and "[t]he master will watch over their health with vigilance and fidelity[,] . . . tak[ing] the best methods . . . to prevent diseases, [and] to ensure a speedy recovery from them." Id.

The parties agree that from December 30, 2014 to October 16, 2020, Aadland was paid maintenance of $84 per day by BSR II,[1] which amounted to $175,664 in total. There is no dispute before us regarding whether the defendants satisfied their duty of "maintenance."

The picture is more complicated with respect to whether the defendants satisfied their duty of "cure." That is in part

---

[1] Aadland received the first payment from BSR II on February 5, 2015, containing the amount owed by BSR II to Aadland from December 30, 2014 until February 5, 2015.

because, for a portion of the period that followed Aadland's on-ship infection, he used private health insurance that he had through his wife's employer to pay for the costs of the healthcare that he received related to that infection. It was not entirely clear at the time that the Tufts health insurance plan furnished by his wife's employer covered the costs of treating his on-ship illness, because it was a work-related illness.[2]

In addition, after Aadland's wife lost her job, Aadland personally enrolled in the Tufts COBRA plan, at a cost of approximately $2,000 per month.[3] For most of the period in which Aadland was enrolled in the Tufts COBRA plan, BSR II paid Aadland an "advance" of $114 per day. Aadland began receiving advance payments six months after he fell ill on the ship.[4]

BSR II referred to the payments when made as "advance" payments. BSR II also made these payments with the disclaimer that "the amount of any settlement, judgment or award" "resulting

---

[2] Aadland's health insurance policy contained a disclaimer that his insurer "will not provide coverage for any injury or illness for which it determines that benefits are available under any workers' compensation coverage or equivalent employer liability."

[3] Since April 2017, Medicare has been Aadland's primary insurer, but Aadland has also purchased a supplemental healthcare plan. Aadland testified that he enrolled in the Tufts COBRA plan in October 2014.

[4] As already discussed, Aadland received the first payment from BSR II in February 2015, which included payments for December 2014-February 2015.

from [a] claim for personal injuries or illness occurring [in July 2014] while aboard the F/V Linda" "will be reduced by the amount of the advance."

Aadland received a total of $238,374 in advance payments. He used a portion of those payments to pay the premiums for his Tufts COBRA plan, which he in turn relied on to pay for the costs of the treatment that he received for his on-ship illness during this period. There is no indication in the record that Aadland has reimbursed the defendants for any of the funds that he received as "advance payments."

In addition, BSR II reimbursed Aadland for his out-of-pocket medical expenses owing to his on-ship illness. These included expenses such as those he incurred from the co-payments he was required to make under his insurance plan.

Finally, after the commencement of this suit, BSR II paid Aadland's health insurer, Tufts, $400,000 "in full satisfaction of any lien or claim [the insurer, Tufts,] might have against [the] Aadland[s] . . . for coverage of Aadland's medical expenses." BSR II made this payment on the eve of trial.

Aadland filed his lawsuit against the F/V Linda, BSR II, BSR III, and their owners on July 7, 2017. Aadland's operative complaint alleges that the defendants breached their duty of cure, which he contends his on-ship illness triggered. His complaint claims that he is entitled to damages in the amount of the total

cost of the healthcare that he received to treat his July 2014 infection, as well as compensation for pain and suffering that resulted from the defendants' delay in providing him with the payments for cure that he contends that he is owed. See Hines v. J.A. LAPorte, Inc., 820 F.2d 1187, 1190 (11th Cir. 1987) (affirming an award of compensatory damages for "prolonged . . . pain and suffering" that resulted from the defendant's failure in that case to timely provide maintenance and cure); Stevens v. Seacoast Co., 414 F.2d 1032, 1040 (5th Cir. 1969) (noting that if the delay in providing adequate maintenance and cure "contributed in any degree to additional pain or disability or prolonged the recovery period," "resulting damages [from that delay] are due"). Aadland's complaint further alleges that the defendants' failure to provide him with adequate cure payments was willful and thus that he is entitled to punitive damages, attorney's fees, and costs. See Atl. Sounding Co., 557 U.S. at 407-08 (holding that punitive damages can be awarded if a shipowner's failure to timely pay maintenance and cure was "willful"); Vaughan v. Atkinson, 369 U.S. 527, 530-31 (1962) (holding that attorney's fees can be awarded if a seaman proves that a shipowner failed to timely provide maintenance and cure); Robinson v. Pocahontas, Inc., 477 F.2d 1048, 1051 (1st Cir. 1973) (explaining that where a shipowner was "callous, willful, or recalcitrant in withholding [maintenance or

cure] payments," the seaman may recover punitive damages as well as attorney's fees).

The defendants filed their answer to Aadland's complaint on September 11, 2017. They moved thereafter for summary judgment on the issue of whether they "willfully" failed to provide adequate maintenance and cure. They did not, at that time, move for summary judgment on the underlying issue of whether they had fulfilled whatever duty of maintenance and cure they had to Aadland in consequence of his on-ship illness.

The District Court denied the defendants' summary judgment motion on November 25, 2019. The case then proceeded to a three-day bench trial.

At the bench trial, the District Court heard testimony from Aadland, his wife, and Frank Patania, one of the owners of the vessel on which Aadland worked when he fell ill. Evidence admitted into the record included Aadland's medical bills, payments from BSR II to Aadland, communications between Aadland's wife and Frank Patania, and communications between Frank Patania and BSR II's insurance broker regarding Aadland's illness.

The District Court entered judgment on October 16, 2020, in favor of the defendants under Federal Rule of Civil Procedure 58. After finding the facts described above, see Aadland v. Boat Santa Rita II, Inc., No. 17-cv-11248, 2020 WL 6119926, at

*1-3 (D. Mass. Oct. 16, 2020), the District Court issued its legal conclusions.

The District Court first addressed whether the defendants had any ongoing duty of cure or whether they did not because Aadland had reached what is known as the point of maximum medical recovery. That is the point at which the seaman who has suffered an on-ship illness or injury "is 'so far cured as possible,'" Whitman v. Miles, 387 F.3d 68, 72 (1st Cir. 2004) (quoting Farrell v. United Sates, 336 U.S. 511, 518 (1949)), such that the shipowner no longer has a duty of cure to satisfy. The District Court found that "[t]here [was] no evidence that Aadland ha[d] not reached maximum medical recovery," given that Aadland had testified that "he only saw his cardiologist, infectious disease doctor and primary care physician every six months for checkups and . . . was discharged from occupational therapy to begin a home exercise program." Aadland, 2020 WL 6119926, at *3. The District Court concluded on that basis that the defendants could "terminate maintenance and cure" to Aadland on a going-forward basis (assuming, that is, that it had satisfied its duty up until that point). Id. (quoting Saco v. Tug Tucana Corp., 483 F. Supp. 2d 88, 99 (D. Mass. 2007)).

The District Court next addressed whether the defendants had satisfied their duty of cure up until the point at which

- 11 -

Aadland had reached maximum medical recovery. It ruled that the defendants had. Id. at *3-4.

Finally, the District Court concluded that Aadland's claim seeking damages for emotional distress, punitive damages, and attorney's fees could not succeed because Aadland could not establish that the defendants willfully withheld maintenance and cure payments that he was due. Id. Thus, the District Court granted judgment to the defendants on these claims as well.

Aadland thereafter timely appealed.

**II.**

"When a district court conducts a bench trial, its legal determinations engender de novo review," as do its "determinations about the sufficiency of the evidence." United States v. 15 Bosworth Street, 236 F.3d 50, 53 (1st Cir. 2001). Its factual findings are reviewed for clear error. See id.; see also Fed. R. Civ. P. 52(a)(6).

A district court's resolution of mixed questions of law and fact is typically treated with deference. But, if the district court "'premise[s] its ultimate finding . . . on an erroneous interpretation of the standard to be applied,' . . . we treat the trial court's conclusion as a question of law," entitled to no deference. Vinick v. United States, 205 F.3d 1, 7 (1st Cir. 2000) (alteration in original) (quoting United States v. Parke, Davis & Co., 362 U.S. 29, 44 (1960)).

## III.

We start with Aadland's challenge to the District Court's grant of judgment to the defendants on his claim that they breached their duty of cure to him. A premise of this challenge is that he is entitled to a cure award that is equal to the cost of the reasonably necessary medical care that he received to treat his on-ship illness, even if he did not personally pay that full cost in receiving that care because he relied on private insurance to pay it. An additional premise of this challenge is that the cost of this care in his case is properly measured by the "sticker price" of $1.2 million that his healthcare providers charged for that care and not some lesser amount, such as the amount that his healthcare providers accepted as payment from his insurer for the care that they provided to him in treating his on-ship illness.

Based on these twin premises, Aadland contends that the District Court erred in granting judgment to the defendants on the breach-of-the-duty-of-cure claim because the defendants did not, and still have not, paid him that $1.2 million amount that he contends that they owe him as cure. And that is so, he contends, notwithstanding that he acknowledges in pressing this challenge that the defendants have made some payments directly to him and one payment (of $400,000) directly to his insurer in return for its release of his liability to the insurer.

- 13 -

Of course, as Aadland acknowledges, he did not actually pay $1.2 million for the care that he received to treat his on-ship illness. He instead paid for that care, as we have seen, chiefly through a private insurer, though he did also incur some out-of-pocket expenses in the form of co-pays and the like. He thus does not dispute that he was out-of-pocket for the care only for the amount of the premiums that he had to pay for the insurance and for the costs of the co-payments and the like, and that this amount is far less than the amount of cure that he seeks.

Nor does Aadland dispute that his healthcare providers did not themselves receive $1.2 million for the care that they provided to him. Instead, he concedes that they received as payment for that care only roughly $600,000, which was paid to them by Tufts pursuant to both the Tufts plan that his wife had through her employer and through the Tufts COBRA plan.

Nonetheless, Aadland contends that, based on the logic of a Fifth Circuit ruling whose reasoning he asks us to adopt, Gauthier v. Crosby Marine Service, Inc., 752 F.2d 1085 (5th Cir. 1985), the defendants are still obliged to pay him the $1.2 million pursuant to their duty of cure. For, he contends, that case rightly holds that when "a seaman alone purchase[s] medical insurance," id. at 1090, and relies on it to pay the costs of the care that he receives to treat an on-ship illness or injury, then the proper measure of the shipowner's cure obligation is the cost

- 14 -

of that care and not either the out-of-pocket cost to the seaman of receiving it or the amount that the healthcare providers accepted for such care from the insurer.

Moreover, Aadland contends that Gauthier also was right in holding one more thing -- that, in a circumstance in which the seaman relied on health insurance that he alone purchased to cover the costs of the care that he received for his on-ship illness or injury, the shipowner is not entitled to set off the amount that the healthcare providers received from the seaman's health insurer as payment for that care from the shipowner's obligation to pay cure in the amount of the costs of that care. Id. Thus, he contends, based on Gauthier, the defendants here may not set off from what he contends is their $1.2 million cure obligation the roughly $600,000 that Aadland's healthcare providers received from the insurer to pay for the treatment of Aadland's on-ship illness.

For these reasons, Aadland contends that the District Court's grant of judgment to the defendants cannot stand because the District Court declined to apply Gauthier to his case, based on reasons for doing so that he contends are not sound. For, by failing to apply Gauthier here, he contends, the District Court erroneously concluded both that the defendants are entitled to set off from their cure obligation the roughly $600,000 that his healthcare providers received from the insurer and that, given the set-off and the payments made to Aadland by the defendants, Aadland

- 15 -

had incurred no expense for the care that he received for his on-ship illness, he was not entitled to any additional payment as cure. He further contends that there is no alternative ground manifest in the record on which we can affirm the District Court's ruling granting judgment to the defendants on his claim that they are in breach of their duty of cure. And that is so, he contends, even if we were to agree with him that the District Court's reasoning in so granting judgment on that claim was flawed.

We approach this case, as the parties do and as the District Court did, on the assumption that Gauthier guides our analysis -- but without barring attention to that issue in the future. As we will explain, we conclude that there is merit to Aadland's challenge to the District Court's ruling granting judgment to the defendants on his breach-of-the-duty-of-cure claim. Moreover, as we will also explain, we agree with Aadland that we cannot affirm the District Court's grant of judgment to the defendants on that claim on an alternative ground, at least given the arguments that the defendants have made to us. Finally, because of these conclusions, we will also address the question of what the proper measure of cure is in this case insofar as there is no basis for applying Gauthier here, so that the District Court on remand may determine based on that amount the extent to which all, or any, of the defendants' cure obligation has been satisfied.

- 16 -

**A.**

We start with the issue that the District Court found to be dispositive, which concerns the applicability of Gauthier to this case. Given that the District Court declined to apply Gauthier here because it determined that Gauthier was factually distinguishable rather than wrongly decided, a brief review of the facts of that case is in order.

The shipowners in Gauthier had initially paid maintenance and cure to the seaman after the seaman had suffered injuries while aboard their vessels. See Gauthier v. Crosby Marine Serv., Inc., 499 F. Supp. 295, 298 (E.D. La. 1980), on reconsideration, 536 F. Supp. 269 (E.D. La. 1982). The shipowners had then stopped doing so after the seaman's condition had worsened. Id. They stopped doing so, moreover, despite the seaman's affirmative request for continued cure. Id.

The seaman in that case, after having had his request for cure rebuffed, turned to his private insurer to pay for the costs of his medical care pursuant to a policy that he had alone purchased with no help from either shipowner. After having used that insurance to pay for his treatment of his on-ship-injuries, he then sued the shipowners who had denied him further cure payment. Id.

The shipowners defended against the suit in part by arguing that they were entitled to set off from their cure

- 17 -

obligation the payments that the seaman's insurer had made for the seaman's healthcare attributable to his on-ship injuries. See Gauthier, 752 F.2d at 1090. Moreover, the shipowners argued on that basis that they did not owe the seaman the cure that he sought because the costs of the seaman's medical care for his injuries that had been paid for by the insurer was not an "expense" that the seaman had incurred. Id.

Gauthier rejected the shipowners' contention. It held instead that the seaman "had incurred expenses" because he alone had paid the premiums that secured the private health insurance that he had used to pay for the healthcare that he had received to treat his on-ship injuries. It further held that "where a seaman has alone purchased medical insurance, the shipowner is not entitled to a set-off from the maintenance and cure obligation moneys the seaman receives from his insurer." Id. The court reasoned that "the policy of protecting injured or ill seamen" at the root of maintenance and cure "would be hampered if a shipowner, in hopes of reducing his liability, delayed maintenance and cure payments to force seamen to look first to their private insurer." Id.

In granting judgment to the defendants on Aadland's breach-of-the-duty-of-cure claim, the District Court did not purport to take issue with Gauthier's holding that the shipowners in that case were not entitled to the set-off. Instead, it ruled

that Gauthier was distinguishable as a factual matter from Aadland's case and that, in consequence, its no-set-off rule did not apply here. Aadland, 2020 WL 6119926, at *4.

The District Court first noted that Aadland, unlike the seamen in the cases on which Gauthier relied, had not requested cure from the defendants. It also noted, relatedly, that, as a result, the defendants were "not aware of Aadland suffering any dire financial straits" due to his medical expenses and had not refused any request from Aadland for cure. Id. The District Court then explained that while the seaman in Gauthier had incurred expenses personally in the form of the payments that he made to cover the costs of the premiums for the insurance he relied on to pay for his care, "Aadland ha[d] not incurred any medical expenses himself and even his health insurance premiums, which were part of the basis of the calculation of the advances he has received from BSR II, have been covered." Id. Nor, the District Court noted, are there "outstanding medical expenses or reimbursements for Aadland's medical care that Aadland is obligated to pay." Id.

The District Court explained that "under these circumstances," Aadland, 2020 WL 6119926, at *4 (emphasis added), Gauthier's rule that where a "seaman alone purchase[s] medical insurance," the shipowner cannot reduce its cure obligation by the amount of money the seaman receives from his insurer, Gauthier, 752 F.2d at 1090, does not apply. And, after accounting for the

- 19 -

set-off of the roughly $600,000 that Aadland's medical providers accepted as payment for their treatment of his on-ship illness, the District Court then granted summary judgment to the defendants on Aadland's breach-of-the-duty-of-cure claim on the ground that Aadland had incurred no expenses for his treatment, at least given the payments that had been made directly to him by the defendants.

As this recitation of the decision below shows, the District Court's ruling that Gauthier could be distinguished from Aadland's case rested, at least in part, on the ground that Aadland failed to request cure as the seaman in that case had. But, the District Court did not hold that a seaman must request cure to be entitled to it. Moreover, the defendants concede on appeal that a shipowner's duty to provide maintenance and cure to a seaman who falls ill or is injured at sea includes the duty to inform the seaman that the shipowner has that duty, and they do not dispute Aadland's contention that they did not inform him of their obligation in that regard.

Thus, we do not see how the fact that Aadland failed to request cure from the defendants provides a basis for concluding that Gauthier's no-set-off rule is inapplicable here, insofar as that no-set-off rule is otherwise applicable. For, if Aadland had no duty to request cure and was not informed by the defendants of their duty to provide cure to him, then his failure to have requested cure could not relieve the defendants of whatever cure

- 20 -

obligation to him that they otherwise would have had. The question thus would remain under Gauthier -- absent some other reasons for deeming it to be inapplicable -- as to whether the defendants were entitled to reduce their cure obligation by setting off the payment that the insurer made to Aadland's healthcare providers to treat his on-ship illness.

But, as we have noted, the District Court did not suggest that Gauthier erred in holding that defendants are not entitled to set off such payments when the seaman alone purchased the health insurance on which he relied to cover the costs of his care. Nor did the District Court find that Aadland did not alone purchase the health insurance on which he relied to obtain his care for his on-ship illness. Nor, finally, did the District Court hold that any of the other unique features of Aadland's case on their own, and without the added feature of his not having requested cure, suffice to render Gauthier inapplicable. Thus, the District Court appears to have held that the defendants were entitled to the set-off without finding that Aadland did not alone purchase the insurance that he used to pay for his medical care, and the District Court did so based, at least in part, on a reason that (insofar as Gauthier's rule itself goes unchallenged) does not justify that conclusion -- namely, that Aadland did not request cure at any point.

Accordingly, because the District Court did not hold that the defendants would be entitled to judgment on Aadland's breach-of-the-duty-of-cure claim even if they were not entitled to the set-off, we cannot affirm that ruling. Instead, we must vacate it, because it rests on an impermissible ground for distinguishing Gauthier and does not otherwise explain why Gauthier does not apply.

**B.**

The defendants contend, however, that even if the District Court's reasons for distinguishing Gauthier do not hold up, there is an alternative ground for affirming the District Court's ruling granting judgment to them on Aadland's breach-of-the-duty-of-cure claim. And that is so, they contend, because the record incontrovertibly shows that Aadland, unlike the seaman in Gauthier itself, did not "alone purchase[] [his] medical insurance," Gauthier, 752 F.2d at 1090, and so incurred no "expense" for his care (at least given what the record shows regarding the other payments that the defendants made either directly to him or to his insurer). Thus, they argue, even under Gauthier itself, Aadland is wrong to contend that the District Court erred in ruling that the defendants were entitled to the set-off and that he has incurred no expenses for the care that he received, at least given the payments that have been made directly to him by the defendants. But, although we may affirm the District

- 22 -

Court on any ground manifest in the record, see Ungar v. Arafat, 634 F.3d 46, 51 n.4 (1st Cir. 2011), we cannot do so here for the reasons that we will next explain.

To be sure, the record does show -- without dispute -- that, just as the District Court found, the premiums for the insurance that Aadland relied on during the first three months following his on-ship illness to pay for the costs of his care attributable to his on-ship illness were deducted directly from his wife's paycheck rather than his own. But, while there is precedent to support the notion that a seaman who receives financial assistance from his parent in the wake of his on-ship illness or injury does not thereby incur an expense that is a "charge" on the shipowner, see, e.g., Johnson v. United States, 333 U.S. 46, 50 (1948); In re RJF Int'l Corp., 334 F. Supp. 2d 109, 113 (D.R.I. 2004), we agree with Aadland that the nature of the relationship between the seaman and the person providing financial assistance to him matters. And, given that it is not unusual for a married couple to share finances, we are not persuaded by the defendants' implicit assertion that the use of one spouse's paycheck to fund the insurance of the other is necessarily a "gift" from the one to the other in the same way that perhaps a parent paying the premiums of an adult child might be viewed.

- 23 -

Indeed, in the maintenance context, an injured seaman might stay at home to recover, and his spouse might pay the rent or mortgage for that home at that time. But, we do not agree that means that the spouse is "gifting" the seaman shelter, such that the seaman cannot get maintenance to help pay the rent or mortgage. Cf. Saco, 483 F. Supp. 2d at 101-02.

Thus, the record does not compel the conclusion that Aadland did not alone purchase his insurance -- and so did not incur any expense in consequence of his reliance on it to pay for his care -- during this period. Instead, it provides a supportable basis for finding that he did. Accordingly, at least as to this period, we conclude that the District Court's grant of judgment to the defendants on Aadland's breach-of-the-duty-of-cure claim must be vacated, absent a finding about the nature of the financial relationship between Aadland and his spouse that would support a finding that he did not incur an expense from the costs of paying the premiums during this period.

Nor can we agree with the defendants that the record conclusively shows that Aadland did not alone purchase his insurance -- and so, for that reason, incurred no expense -- during the ensuing period in which he relied on his Tufts COBRA health insurance to pay his healthcare providers for the costs of the care he received to treat his on-ship illness. The defendants point out that the record indisputably shows that, during this

period, Aadland received "advance" payments from the defendants that he then used to pay the premiums for the Tufts COBRA insurance.  They go on to contend that, as a result, they, rather than Aadland, purchased that insurance.  See, e.g., Shaw v. Ohio River Co., 526 F.2d 193, 200-01 (3d Cir. 1975) (finding that a shipowner was entitled to a set-off for the medical expenses paid for by a health insurance plan it provided to its seamen at no expense to themselves).

But, the District Court did not find, and the record does not incontrovertibly show, that the advance payments were made to Aadland in a form other than as a loan.  For, while the District Court found that Aadland had not paid the defendants back for the advance payments as of the time the District Court issued its judgment, Aadland, 2020 WL 6119926, at *2, the relevant question is whether the advance payments were made to Aadland pursuant to an agreement between Aadland and the defendants that Aadland did not need to pay the defendants back for those payments.[5]

---

[5] The defendants argue that because the advance payments are best understood as maintenance and cure payments, there is no expectation that Aadland pay the advance payments back.  See Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 366 (1st Cir. 2016).  But, the defendants do not contend that they represented that the payments were maintenance or cure payments at the time that they were made to Aadland.  Instead, they contend that they should be understood as much at present because of the way they were calculated.  We thus leave the resolution of this factual dispute about the nature of the payments at the time that they were made to the parties and the District Court on remand.

After all, if those payments were not made pursuant to such an agreement, then Aadland was merely loaned money by the defendants that he owed to them. And, in that event, Aadland would have been in all relevant respects "abandon[ed] . . . to his fate" and own devices to cover the costs of caring for his on-ship illness during the period in which he was enrolled in the Tufts COBRA insurance. The Dutra Grp. v. Batterson, 139 S. Ct. 2275, 2286 (2019) (quoting McBride v. Etis Well Serv., L.L.C., 768 F.3d 382, 394 n.12 (5th Cir. 2014) (Clement, J., concurring)). For, we see no basis for concluding that a shipowner may evade Gauthier's no-set-off rule by making the seaman a loan to cover the costs of the insurance that the seaman then alone purchases and relies on to pay for the healthcare that he needs to treat an on-ship illness.

Indeed, the proposition that a shipowner may not evade Gauthier's no-set-off rule by making a loan to the seaman to cover the costs of his private health insurance is not itself disputed by the defendants. Nor was that proposition rejected by the District Court.

In addition, the proposition accords with -- even if it is not compelled by -- Gauthier's own rationale for not allowing a set-off of the payments made by an insurer pursuant to insurance that the seaman alone purchased. Gauthier cautioned that if a shipowner were able to reduce its cure obligation in such a

- 26 -

fashion, then the shipowner would be incentivized to "delay[] maintenance and cure payments to force seamen to look first to their private insurer" -- an outcome the court there concluded was at odds with the duty's aim of "protecting injured or ill seamen." 752 F.2d at 1090.

This proposition draws additional support from the Supreme Court's decision in Vaughan v. Atkinson, 369 U.S. 527 (1962). There, the Court held that a shipowner cannot "force the disabled seaman to work, and then evade part or all of their [maintenance] obligation by having it reduced by the amount of the sick man's earnings," because otherwise "unconscionable employers . . . [would] use the withholding of maintenance and cure as a means of forcing sick seamen to go to work when they should be resting, and to make the seamen themselves pay in whole or in part the amounts owing as maintenance and cure." Id. at 533. And, we note, this proposition accords as well with the rule that a shipowner may reduce the cost of its cure obligation via the seaman's admission to a public marine hospital that provides medical care only if the shipowner first presents the injured or ill seaman with "a master's certificate carrying admittance to a public hospital." Kossick v. United Fruit Co., 365 U.S. 731, 737 (1961); see also Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 531 (1938).

Thus, insofar as the record may be deemed to show that the "advance payments" were made to Aadland as a loan, there would be no basis for finding that he did not alone purchase the Tufts Cobra Plan insurance and so no basis for affirming the District Court's ruling that the defendants are entitled to the set-off they seek. There then also would be no basis for concluding, given Gauthier, that the defendants are entitled to a grant of judgment on Aadland's breach-of-the-duty-of-cure claim.

Accordingly, because of the uncertain nature of the record as to whether Aadland did or did not alone purchase the insurance in question, the defendants' proposed alternative ground for affirming the District Court's grant of judgment to the defendants on Aadland's breach-of-the-duty-of-cure claim fails. We thus vacate and remand the District Court's judgment for the defendants on Aadland's breach-of-the-duty-of-cure claim, so that the District Court may make the findings that have not yet been made but that bear on whether Aadland did alone purchase his insurance during the periods in question. For, we emphasize, if he did alone purchase that insurance, then the defendants would not be entitled to set off from their cure obligation the roughly $600,000 payment that Aadland's medical providers received from the insurer as payment for their treatment of his on-ship illness. And thus, the determination of whether Aadland was entitled to recover on his breach-of-the-duty-of-cure claim would have to be

assessed on the understanding that no such set-off could be claimed by the defendants, which is an assessment that the District Court has not yet made.[6]

C.

Having determined this much thus far, the question as to what the proper measure of cure is in this case necessarily also presents itself. That question is plainly relevant to the issue that may arise on remand concerning how much of the defendants' cure obligation (if any) has been satisfied (set-off not included) through payments that they have made, either directly to Aadland or to the insurer, Tufts.

As we have noted, with respect to the issue of the amount of cure that is owed, Aadland contends that, if Gauthier applies, then he is owed as cure the "sticker price" of the healthcare that he received, which is $1.2 million. That amount, Aadland contends,

---

[6] There is a third period concerning Aadland's coverage that is worth noting. Since April 2017, Aadland's healthcare has been paid for through Medicare and a private supplemental health insurance plan he pays for. No party advances a separate reason for distinguishing Gauthier based on the source of Aadland's health insurance during this third period. Nor do we purport to comment on whether these facts would provide a basis for distinguishing Gauthier. Compare Moran Towing & Transp., Co. v. Lombas, 58 F.3d 24 (2d Cir. 1995), with Gypsum Carrier, Inc. v. Handelsman, 307 F.2d 525 (9th Cir. 1962).

represents the reasonable costs of his care, given that it is the amount that his healthcare providers charged for it.[7]

The defendants contend in response, however, that, insofar as Gauthier does apply here, the proper valuation of the cure obligation is still at most the amount that Aadland's healthcare providers accepted as full payment from the insurer for his care. And, they assert, that amount comes to approximately $600,000, which is considerably less than the $1.2 million amount that Aadland favors.

In pressing for this lesser amount to measure the cure obligation even under Gauthier, the defendants first emphasize, correctly, that Gauthier never resolved how much cure the shipowner there owed the seaman; Gauthier only determined that the shipowner was not entitled to set off the payments that the insurer made to cover the cost of the seaman's care against its cure obligation. The defendants then further note that it was not until Manderson v. Chet Morrison Contractors, Inc., 666 F.3d 373 (5th Cir. 2012), that the Fifth Circuit reached the question of what the cure obligation would be in a situation in which Gauthier applied. They

_____

[7] Aadland does not develop an argument to us that the proper measure of cure in his case is the cost of his care -- be it the "sticker price" or the roughly $600,000 his healthcare providers accepted as payment -- plus the cost of his premiums and out-of-pocket expenses. We thus deem such an argument waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

- 30 -

then contend that Manderson undermines Aadland's position that the proper measure of cure is $1.2 million in his case.  We agree.

The defendants point out that Manderson held that when a seaman alone purchases his medical insurance, such that Gauthier's no-set-off rule applies, "the relevant amount" owed as cure is not the "sticker price" the healthcare providers assign to the care that they provided to the seaman to treat his on-ship illness or injury.  Rather, "the relevant amount is that needed to satisfy the seaman's medical charges," which there was the "lower amount paid by [the seaman's] insurer."  Manderson, 666 F.3d at 382.  Thus, the defendants contend, because "the amount paid by" Aadland's insurer was only approximately $600,000, Aadland cannot, given Manderson, be entitled to a cure award that is pegged to the $1.2 million "sticker price" that his healthcare providers assigned to the care that they provided to him to treat his on-ship infection.

Aadland contends otherwise by arguing that, under Manderson, the lower measure of cure that the Fifth Circuit there embraced only applies if the shipowner has taken a proactive step toward ensuring that the seaman has a way to pay for the care needed to treat his on-ship injury or illness.  And, he contends, the record shows that, unlike in Manderson, the defendants in this case "played no part in the proactive procurement or payment of" the health insurance that was used to pay for the care in question.

Thus, he contends, he is entitled to a cure award pegged to the $1.2 million sticker price, notwithstanding that his health care providers in fact accepted a much lower amount.

But, we are not persuaded by Aadland's contention. Manderson does not purport to limit its holding regarding the proper measure of cure in a case in which a seaman relies on insurance that he alone purchased to pay for the healthcare that he received for an on-ship illness or injury to the circumstance in which the defendants took steps to ensure that the seaman had a way to pay for his insurance (without, of course, going so far as to pay for that insurance). Moreover, Aadland himself acknowledges that the defendants here knew at the time that they made the advance payments that Aadland had health insurance that he was relying on to pay for his care. And, while the record does show that there are questions about whether the insurance would cover those costs, we see no basis for concluding that the mere possibility that coverage could be denied in and of itself suffices to make Manderson's approach to defining the measure of cure inapplicable in a case like this. That is at least the case given that there is no dispute that the defendants in this case did take some measures to ensure that the seaman to whom the duty of cure would be owed could procure insurance, such as by, at the very least, loaning him money to procure it through the advance payments that they made to him. Nor, we add, did Aadland have his requests

for coverage denied by Tufts during the period in which he was relying on that insurance to pay for his care.[8]

Thus, we conclude that, insofar as Gauthier does apply, we cannot agree with Aadland that the duty of cure is defined in his case by the sticker price for the healthcare that he received but that neither he nor his insurer was charged. Instead, insofar as Aadland did alone purchase the insurance in question, such that Gauthier applies, the cure owed here is the roughly $600,000 that

---

[8] We note that, insofar as the defendants mean also to assert that Aadland is actually entitled only to a much lower amount of cure, as defined chiefly by the costs of the premiums for his health insurance plus any expenses attending to his reliance on that insurance (rather than the cost of the healthcare itself), the District Court did not so hold. (The District Court only determined that Gauthier was distinguishable; it did not then reach the issue of what the defendants' cure obligation would be if Gauthier was not distinguishable.) Moreover, Manderson, applying Gauthier, does not hold that the cost of the premiums is the right measure of cure when a seaman alone purchases insurance, see 666 F.3d at 382, and the defendants do not develop any argument for why Manderson's reasoning should not apply here. Thus, any such argument is waived. See Zannino, 895 F.2d at 17 ("[A] litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace." (quoting Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988))).

We note, too, that insofar as the defendants mean to contend that, if the amount accepted as payment by the healthcare providers is the measure of cure, that amount here is only $400,0000 because that is the amount that they paid directly to the insurer in return for its release of Aadland of any liability owing to the payments that it made to the healthcare providers for that care, we also cannot agree. And that is so, because the defendants do not purport to take issue with Manderson, which stated that the correct value of the cure obligation in that case was "the lesser amount those providers accepted as full payment from Manderson's insurer," 666 F.3d at 381-82 (emphasis added).

- 33 -

his healthcare providers accepted as payment for his care from his insurer.

Of course, there still does remain the question of whether, given that the cure owed would be roughly half of the $1.2 million amount that Aadland is suing to obtain, the defendants have satisfied their duty of cure. The defendants contend that they have done so by virtue of the payments that they made to Aadland and his insurer since Aadland fell ill in July 2014 and the fact that his wife paid for a portion of his health insurance premiums.

But, the District Court has not addressed this question. That is so, because it was of the view -- which we have rejected -- that the defendants could set off the roughly $600,000 paid for Aadland's care by the insurer because, in part, Aadland failed to request cure.

Thus, we leave to the District Court on remand the assessment of what cure was paid -- insofar as, that is, the District Court finds on remand that Aadland did alone purchase the insurance on which he relied to pay for his care for some period of the time in question. Nonetheless, we do make the following observations with respect to that assessment.

First, and by way of recalling our analysis above concerning how Gauthier applies here, if the District Court were to find on remand that the advance payments were made with the

understanding that Aadland would not by accepting them incur a debt to the defendants, then, at least as to the period of time for which Aadland used the payments to pay for the premiums for the insurance that he used to pay for the healthcare that he received for is on-ship illness, Gauthier would be distinguishable. And, in that event, the defendants, for such period, would appear to have fulfilled their cure obligation, given the set-off to which they would be entitled.

But, if the District Court were to find on remand that Aadland incurred a debt from his receipt of the advance payments, then a distinct set of questions would arise concerning how to calculate what amount of cure was owed and what amount had been satisfied. And, as to that set of questions, we offer the following guidance.

To the extent that the District Court were to find on remand that the debt had been incurred by Aadland from his receipt of the advance payments but that some or all of the debt then had been extinguished, it may be that a portion of the amount of the extinguished debt would satisfy some of the defendants' cure obligation. We say no more on this score, however, because the parties do not develop on appeal an argument as to whether the amount of any extinguished debt incurred from receipt of the advance payments should be credited against the defendants' cure obligation, and if so, in what amount.

Indeed, neither party advances an argument even as to whether any such amount of extinguished debt should be credited against the defendants' cure obligation of roughly $600,000 (as measured by the amount of payment accepted by Aadland's health care providers from the insurer) or viewed as covering the costs of an additional part of the defendants' cure obligation. On the latter view, we note, the amount of the defendants' cure obligation would not be just the roughly $600,000 that the healthcare providers accepted as payment from the insurer. It instead would be that amount plus the cost of (at least a portion of) the premiums for the insurance that the insurer provided as well as Aadland's out-of-pocket expenses for the healthcare that he received for his on-ship illness in the form of co-payments and the like.

We thus leave this nuanced set of questions to the District Court to address on remand. That way the District Court may address those questions after having heard whatever arguments the parties may make to it, including any arguments that the parties may choose to make to it as to whether any arguments pertaining to this set of questions have been waived over the course of this litigation by either party.

There is also the question of whether the defendants' payment of $400,000 to the insurer, or any portion of that payment, may count toward the satisfaction of the defendants' cure obligation and how that payment may bear on the amount of that

obligation. But, here, too we leave these questions to the District Court, given the limited arguments touching on them that have been made to us by the parties on appeal. This approach will enable the District Court to resolve these questions in the first instance with the aid of having heard whatever arguments the parties may choose to make, given that the parties have not developed arguments pertaining to those questions to us on appeal.

Finally, we note that if the District Court were to conclude on remand that Aadland did not alone purchase his health insurance either only during the period in which he received his health insurance through his wife's employer-sponsored plan or, alternatively, only during the period in which he was covered by the Tufts COBRA plan following her termination from her job, then there would remain the question of how much cure Aadland must still be paid by the defendants as cure for that specific period. For, in that event, Aadland would not be entitled to recovery for non-payment of cure based on Gauthier for the other period, precisely because he would not have been found to have alone purchased his insurance for that period.

Aadland has not developed, however, a distinct argument to us as to what amount the defendants would owe him as cure in the event that he were to be found to have alone purchased his insurance for only one of the periods identified above rather than

for the whole of the time spanning both periods. Nor, we should add, have the defendants weighed in on this issue to us.

We do note, though, that, given the episodic way that maintenance and cure payments are customarily calculated, it seems plausible that Aadland would be entitled to cure for the cost of the care that he received for such a limited period, notwithstanding that he did not alone purchase the insurance that he relied on to pay for the healthcare that he received during the whole of the time that he was relying on such healthcare to treat his on-ship illness. But, in all events, we leave this question as well to the District Court to resolve on remand, so that, again, it may do so with the benefit of whatever arguments the parties properly advance below.

**IV.**

Having vacated the District Court's grant of judgment to the defendants on Aadland's breach-of-the-duty-of-cure claim, we now come to his additional claim that the defendants' failure to timely pay him adequate cure, to the extent the defendants so failed, was done in "bad faith." Here, Aadland argues that the record shows that the defendants knew of their cure obligation to him and recognized that his health insurance may not cover the costs of his care, yet never communicated its cure obligation to him and waited until "the eve of trial" before reaching an agreement with his insurer to release him from any liability

resulting from his use of his insurance to pay for the care he received to treat his on-ship illness. As a result, Aadland contends that he is entitled to compensatory damages for mental distress for the "mental anguish" that he suffered due to both his need to rely on his insurance to pay for his healthcare despite the ambiguity as to whether the insurance covered those costs, as well as his need to file this suit to receive adequate cure from the defendants. And, Aadland further contends that he is entitled to punitive damages and attorney's fees for the defendants' allegedly willful delay in fulfilling their cure obligation.

As we noted at the outset, the District Court was not persuaded and granted judgment for the defendants on this claim. But, the District Court's judgment in this regard relied on its determination that Aadland was not deprived of any cure owed to him by the defendants because Gauthier did not apply, in part because Aadland did not request cure. Nor, in granting judgment to the defendants with respect to these delay-based claims, did it address the fact that, from the time Aadland fell ill at sea to the time of this suit, Aadland faced the risk of a lawsuit by his insurer to recover the cost of the healthcare his insurance had paid for.

We therefore vacate the District Court's grant of judgment on his claim seeking compensatory damages for emotional distress, punitive damages, and attorney's fees. That way, the

District Court may consider those claims in light of our other conclusions regarding Aadland's claim for cure.

## V.

We have one final ruling by the District Court to address. It concerns whether the defendants have met their burden of proving that Aadland has reached the point of maximum medical recovery.

"Maximum medical recovery" occurs "[w]hen a seaman's 'condition has stabilized,'" Whitman, 387 F.3d at 72 (quoting In re RJF Int'l Corp., 354 F.3d 104, 106 (1st Cir. 2004)), and the seaman is "so far cured as possible," Ferrara v. A. & V. Fishing, Inc., 99 F.3d 449, 454 (1st Cir. 1996) (quoting LeBlanc, 992 F.2d at 397). Even when a seaman's "progress ended short of a full recovery, the seaman . . . is no longer entitled to maintenance and cure" once the shipowner has proven by a preponderance of the evidence that the seaman has reached the point of maximum medical recovery. Whitman, 387 F.3d at 72 (quoting In re RJF Int'l Corp., 354 F.3d at 106); see also Johnson v. Marlin Drilling Co., 893 F.2d 77, 79 (5th Cir. 1990) (describing the burden of proof by which a shipowner must establish that the injured seaman has reached the point of maximum medical recovery as when it is "probable that further treatment will result in no betterment of the seaman's condition" (quoting Gaspard v. Taylor Diving & Salvage

Co., 649 F.2d 372, 374 n.3 (5th Cir. 1981))); 1 Admiralty & Mar. Law § 6:33 (6th ed. 2021) (same).

As part of the defendants' effort to minimize the amount owed to Aadland as cure, if any amount is, the defendants argued to the District Court, as a defense, that Aadland had reached the point of "maximum medical recovery" by July 2019. For that reason, they contend, he is not entitled to cure payments for any healthcare he received for his on-ship illness after that point in time. The District Court agreed, and Aadland now appeals that ruling.

We note at the outset that we are dubious that the issue of maximum medical recovery is properly presented in this case. The defendants, in raising this defense, contend that Aadland reached the point of maximum medical recovery only in July 2019 -- just three months before trial and well after he first became ill. But, it is not clear to us from either the record or the arguments of the parties whether Aadland sought cure from the defendants to cover the cost of treatment he received in that three-month period as Aadland has been paying for his healthcare, at least in part, through Medicare since April 2017.[9] Nor did the

---

[9] The record evidence Aadland points to in support of his statement that he incurred approximately $1.2 million in healthcare expenses lists the last expense paid by Aadland's health insurance as being incurred in March 2017. But, the figure Aadland asserts represents the "sticker price" of his healthcare exceeds

- 41 -

defendants themselves seek a declaratory judgment of any sort on this issue. Nonetheless, the District Court ruled on this issue, and there is ambiguity as to whether Aadland may seek cure for treatment he received after July 2019. We thus address it, and, as we will explain, we conclude that Aadland is right that the District Court's maximum-medical-recovery ruling was wrong.

**A.**

When determining whether a seaman has reached the point of maximum medical recovery, a court must consider whether "further rehabilitation would be more than simply palliative, and would [instead] improve [the seaman's] medical condition." In re RJF Intern. Corp., 354 F.3d at 107 (citations omitted). The burden is on the shipowner to provide evidence that supports, by a preponderance of evidence, its assertions regarding "the earliest time when it is reasonably and in good faith determined by those charged with the seaman's care and treatment that the maximum cure reasonably possible has been effected." Hubbard v. Faros Fisheries, Inc., 626 F.2d 196, 202 (1st Cir. 1980) (quoting Vella v. Ford Motor Co., 421 U.S. 1, 6 n.5 (1975)). It is thus "the medical, not the judicial, determination of permanency that

---

the amount billed to his insurance as of March 2017, and other evidence in the record supports the finding that Aadland has been visiting his doctors after that date and paying for that care with some form of insurance.

- 42 -

terminates the right to maintenance and cure" via maximum medical recovery.  Id.

Here, the District Court determined that, because "[t]here is no evidence that Aadland has not reached maximum medical recovery," the defendants had fulfilled their obligation to provide Aadland with cure.  Aadland, 2020 WL 6119926, at *3. But, by framing the conclusion in that way, the District Court, as Aadland emphasizes in his arguments to us, "shifted the burden to prove [maximum medical recovery] away from [the defendants] and placed the burden to disprove [maximum medical recovery] onto Aadland," such that the District Court committed "an error of law." See also Weeks Marine, Inc. v. Watson, 190 F. Supp. 3d 588, 597 (E.D. La. 2016) ("After a seaman has proved his initial entitlement to maintenance and cure, the burden shifts to the ship owner to prove that maximum cure has been reached."); Saco, 483 F. Supp. 2d at 99 (same); Smith v. Delaware Bay Launch Serv., Inc., 972 F. Supp. 836, 848 (D. Del. 1997) (same); McMillan v. Tug Jane A. Bouchard, 885 F. Supp. 452, 459 (E.D.N.Y. 1995) (same); 1 Admiralty & Mar. Law § 6:33 (same).

If, when reviewing a district court's judgment following a bench trial, the district court "'premise[s] its ultimate finding . . . on an erroneous interpretation of the standard to be applied,' . . . we treat the trial court's conclusion as a question of law," entitled to no deference.  Vinick, 205 F.3d at 6 (quoting

Parke, Davis & Co., 362 U.S. at 44). We thus must proceed by reviewing de novo the District Court's determination that the evidence in the record sufficed to show that Aadland had reached a point of maximum medical recovery. Id.; see also Aldridge v. A.T. Cross Corp., 284 F.3d 72, 84 (1st Cir. 2002) (explaining that this court can "affirm a district court's judgment on any grounds supported by the record" (quoting Greenless v. Almond, 277 F.3d 601, 605 (1st Cir. 2002))).

**B.**

The defendants support their contention that they can meet their burden to show that Aadland has reached a point of maximum medical recovery, such that we may affirm the District Court's ruling as to maximum medical recovery, with reference to three pieces of evidence in the record. First, they point to a note "discharg[ing] [Aadland] from occupational therapy to begin a home exercise program." Second, they point to Aadland's testimony in his October 12, 2018 deposition that "he only saw his cardiologist, infectious disease doctor and primary care physician every six months for checkups." Finally, they point to Aadland's testimony that he went skiing in Maine in 2016.[10] Aadland contends

---

[10] The defendants, in their briefing to us, also present a series of statements made by Aadland's doctors that could indicate that Aadland has reached a point of maximum medical recovery, but none of those statements were admitted into the record before the District Court. As a result, we cannot affirm

- 44 -

that none of these pieces of evidence suffices to permit the defendants to meet their burden of proof as to this affirmative defense, because none of them suffices to show that his treating "physicians [have] made an unequivocal diagnosis of . . . permanency." See Hubbard, 626 F.2d at 202. We agree.

To be sure, the "discharge note" that the defendants point to was from a treating physician. But, the District Court interpreted this document as "discharg[ing]" Aadland from occupational therapy after fourteen sessions so that he could "begin a home exercise program," even though the record shows, as Aadland emphasizes in his briefing to us, at trial, that Aadland testified that, from September 2015 until March 2020 (when COVID made receiving treatment difficult), he "did each year the amount" of physical and occupational therapy he "was allowed to from the insurance company." Aadland further testified that in 2019, the year the "discharge note" was produced, the maximum number of occupational therapy sessions was fourteen -- the same number of sessions he received before the note "discharged" him to proceed with home exercise -- and that he had arranged with his occupational therapist to continue treatment with the sessions he

---

the District Court by referring to any of those documents. Cf. Fed. R. App. P. 10(e); United States v. Rivera-Rosario, 300 F.3d 1, 9 (1st Cir. 2002) ("[A] 10(e) motion is designed to only supplement the record on appeal so that it accurately reflects what occurred before the district court." (quoting Belber v. Lipson, 905 F.2d 549, 551 n.1 (1st Cir.1990))).

had "saved" for later in the year, and "then [in] January of 2020[,] [he] would start with new ones." Thus, it is not at all clear that the "discharge note" -- once it is considered in combination with Aadland's testimony about his occupational therapy -- shows by a preponderance of the evidence that Aadland was receiving "palliative" rather than "rehabilitative" care. See In re RJF Intern. Corp., 354 F.3d at 107.

Nor does Aadland's October 12, 2018 deposition help the defendants to meet their burden of establishing as much. The defendants contend that Aadland's statements that "he only saw his cardiologist, infectious disease doctor and primary care physician every six months for checkups" support a finding that Aadland had reached a point of maximum medical recovery. But, given that Aadland was not asked why he did not see his doctors more frequently at that deposition, it is hard to know whether that frequency of visits speaks to the "palliative" nature of his care or whether that too can be attributed to the limits of his health insurance policy.

It is true that in the same deposition, Aadland did not disagree that his doctors were "not doing anything for [him] at the moment designed for [him] to get . . . better." But, it is not at all clear whether Aadland, in making that statement, was communicating his own opinion of the efficacy of his doctors' care or relaying his doctors' opinions as to his prognosis. And, that

distinction matters as Aadland is not a medical doctor and thus cannot himself make the "medical determination" necessary to determine that he has reached maximum medical recovery -- a reality that the defendants' themselves do not dispute. See Hubbard, 626 F.2d at 202 (quoting Vella, 421 U.S. at 6 n.5).

Finally, the defendants contend that Aadland's testimony at trial that he went skiing in 2016 suffices to show that he has reached a point of maximum medical recovery. But, Aadland testified that he went skiing in 2016 with Maine Adaptive, which he explained is a skiing program for people with disabilities. That fact in and of itself provides no indication of Aadland's prognosis, nor does it suggest whether the treatment he continued to receive in the years that followed was merely "palliative" or was "rehabilitative" in nature. Nor, we add, is the evidence that he went skiing a determination by Aadland's medical doctor that he had recovered to the maximum extent reasonably possible.

## C.

We are thus not persuaded that the evidence to which the defendants point -- even when viewed together -- suffices to meet their burden of demonstrating that Aadland's treating physicians had determined that Aadland had reached maximum medical recovery. Neither the "discharge note" nor Aadland's deposition testimony nor Aadland's time skiing in 2016 suggest that it is more likely than not that, at the time of trial, Aadland's care was

"palliative" rather than "rehabilitative."  We thus conclude that the District Court erred in determining that the defendants' duty to provide cure had terminated, and so we reverse that aspect of the District Court's judgment.

## VI.

For the foregoing reasons, the judgment of the District Court is reversed in part, vacated in part, and remanded for further proceedings.  The parties shall bear their own costs.